Argued November 13, 1945; affirmed April 30, 1946

WOOD et al. *v.* HONEYMAN et al.

(169 P. (2d) 131)

*George Mowry,* of Portland, and *Erskine Wood,* of Portland, (John Mowry, of Portland, on brief) for respondents.

*Elton Watkins,* of Portland, for appellants.

Before BELT, Chief Justice, ROSSMAN, BAILEY, BRAND and HAY, Justices.

ROSSMAN, J.

This is an appeal by David T. Honeyman and Nan Wood Honeyman, husband and wife, two of the three defendants, from a decree which held that the defendant, David T. Honeyman, wrongfully breached the terms of two trusts which were created by Colonel C. E. S. Wood, one of the plaintiffs. One of the trusts was created April 15, 1918, and the other March 1, 1923. The defendant, David T. Honeyman, to whom we shall refer as the defendant, became the trustee of one of these trusts in November, 1921, and of the other at the time of its creation, March 1, 1923. The decree

found that the defendant failed to account for and converted to his own use the sum of $107,859.54, assets of one trust, and $730.63, assets of the other, both of which sums came into his hands in his capacity as trustee. The decree removed the defendant from his office of trustee of each of the trusts, and entered judgment against him for the sums of money just mentioned. After finding that he had wrongfully converted to his own use assets of the trusts, it denied the defendant compensation for his services as trustee.

No decree of any kind was awarded against the defendant, Nan Wood Honeyman. No one charged her with any wrong whatever. Although the joint answer filed by her and her husband did not ask for the relief which was awarded, the decree says:

"The said defendant, Nan Wood Honeyman, is entitled to have and recover of and from said defendant, David T. Honeyman, the remaining one-fifth of said sum of $91,659.54."

That provision, which is criticized by no one, will be explained later in this opinion. We have mentioned two of the defendants. The third was James McI. Wood, a brother of Colonel Wood. No one claims that he had done any wrong. Concerning him the decree says:

"Although he duly and regularly entered his appearance as a defendant in the above-entitled suit, he has not alleged or asserted herein any claim whatsoever to or upon any of the funds or property which are the subject and/or subjects of said suit."

No relief was awarded against him and he is immaterial to this appeal.

As already indicated, two trust funds are the subject matter of this suit. Each constituted a gift of Colonel C. E. S. Wood, an outstanding member of the

Oregon bar until 1918, when he retired from the practice of law and moved to California. The one trust is identified by the parties as the Wood Trust and the other as the Educational Trust.

The trust res of the Wood Trust was a fund of $172,412.80. The trust instrument which created that trust was signed by Colonel Wood April 15, 1918, and provided that the income produced by the fund should be paid to Colonel Wood's wife, Nanny Moale Wood, during her lifetime, and that upon her death the fund should be distributed among the five children of Colonel and Mrs. Wood and to any children of any child who might die prior to distribution. The res of the Educational Trust was a fund of $15,000 which was provided by Colonel Wood. The trust instrument which created that trust was signed March 1, 1923, by Colonel Wood and all of the beneficiaries of his bounty, with the exception of his wife and one of his sons, William Maxwell, who died November 4, 1921. The beneficiaries of the Educational Trust were the three sons of William Maxwell, who were then eight, five and three years of age. A desire to make provision, in part at least, for their education was the circumstance which prompted the creation of the Educational Trust.

Colonel Wood's wife, Nanny Moale Wood, died December 18, 1933. Their children were Nan, Elisa, Erskine, Berwick Bruce and William Maxwell. Nan is the wife of the defendant, and Elisa is the wife of one Kirkham Smith. William Maxwell died in November, 1921, and we shall refer to him as William Maxwell, Sr., so as to distinguish him from one of his three sons who was named in his honor. The ages of the three boys of William Maxwell at the time of their father's death were seven, four and two years. Those three grandsons

of Colonel Wood, together with their grandfather, as plaintiffs, instituted this suit.

When this suit was filed the plaintiffs were the four persons whom we have just mentioned: the creator and three of the beneficiaries of the two trusts. During the course of the trial the aforementioned Elisa, Erskine and Berwick Bruce became plaintiffs. When the complaint was filed the aforementioned David T. Honeyman was the sole defendant. At the conclusion of the taking of the evidence the trial judge, acting upon his own motion, entered an order requiring the aforementioned Nan Wood Honeyman and James McI. Wood to be made defendants. The plaintiffs complied with the order and at the same time made appropriate amendments to the complaint. The purpose was to render possible a complete adjudication of title to the trust funds.

There are nine assignments of error. The first two attack the legality of the summons. The third claims that the ''court never acquired jurisdiction as all beneficiaries of trusts were not made parties to suit.'' The fourth is: ''Court is powerless to authorize amendments to Complaint after trial nor can it bring in new parties without issuing alias summons and Amended Complaint, giving such new party usual time allowed by statute to original parties in which to answer.'' The fifth says that the complaint does not state a cause of suit. The sixth, which pertains to the construction of the trust instrument, thus expresses itself: ''The intention of the creator of the trust must prevail.'' The seventh invokes a defense of laches. The eighth claims it was error ''to remove the trustee summarily and give judgment against him and subject his property to sale upon execution and order execution thereon without at least giving him reasonable opportunity to com-

ply with the orders of the court, and try to save his property from sale on execution.'' The ninth, being the last assignment of error, follows: ''It was error to enter the decrees as rendered in these two suits in the forms as entered and for the relief granted. The intent of Trustor is supreme and the sole guide.''

Before considering the assignments of error we shall state matters which constitute some of their background. The Wood Trust was created by the assignment to William Maxwell, Sr., by Colonel Wood of one-sixth of a large fee due to Colonel Wood from Lazard Freres, of France, whose agent in the United States was a Mr. Charles Altschul. The assignment was accompanied by a letter, signed by Colonel Wood and addressed to the trustee, which outlined the latter's duties. From the letter we quote the following parts:

''* * * This assignment is made to you, and any sums by you received under it shall be received and held by you, upon the following trust and conditions:

''First: The whole thereof, principal and interest, is for your mother's use and benefit during her lifetime upon the plan as hereinafter outlined, the details of which I reserve the right to modify during my lifetime, but I do not reserve any right to change or alter the general intention and condition, but this assignment is made irrevocably for your mother's use and benefit.

\* \* \* \* \*

''Fourth: All moneys received by you under this assignment as principal, * * * you are to safely invest for your mother's use and benefit during her lifetime, paying over to her the net income therefrom at some reasonably certain and convenient intervals, for her own use and benefit, and if she shall save from this income any moneys and invest the same, even though done through you, such shall be her own individual property.

"Fifth: At your mother's death this trust is to cease and you are authorized, though not directed, to make some provision, in case there is any necessity for so doing, to relieve the want of your mother's cousin Lucy Lanier, of Baltimore, and my brother, your Uncle Jim, during their respective lifetimes, if such arrangement has not been made by your brother Erskine out of a certain trust-fund which I have this day vested in him and on which any provision for said Lucy Lanier or your Uncle Jim shall be a charge prior in obligation as between that trust and this one. All such moneys, properties or proceeds as you may have in your hands or under your control in this trust shall, at your mother's death, and after taking care of her cousin Lucy Lanier, and my brother, your Uncle Jim, as above provided in case it is necessary so to do, be divided among yourself and your brothers and sisters, as soon as conveniently may be, but not necessarily equally. What I aim at, and constitute you my agent or trustee to accomplish, is an equity in love and justice rather than mathematical equality between my children. Real equity between you children can, in my opinion, never be reached by an exact arithmetical equality. The needs of some of you will be unequal, your opportunities and fortunes unequal and perhaps, from no fault of your own—but that is a matter I care nothing about; I mean whether the inequality is due to what we call a fault. I want to protect against faults as well as misfortunes. I want the particular misfortunes remedied; the unequal chances corrected and the unequal burdens and responsibilities leveled up as far as money can do it. I want any distress or burden because of inequalities of families, for example, to be relieved, and I want the future of the grandchildren considered, and in this I want you to consider yourself as well as others. It may be embarrassing for you, for example, to have to allot to yourself more than to another, but you are not doing this for yourself; you are acting for me, and I want

you to do by yourself and by yours as I would do under the same circumstances if I were living and in control.

"This trust and the one I am making to your brother Erskine is intended to carry forward after my death the love and justice of affection that I would give to my children if I were able at the time to do so.

"Sixth: In the same way as just above stated, any sums that may be released or revert to this trust on the death of your mother's cousin Lucy, or your Uncle Jim, as above provided, you will, as soon as conveniently may be after such sums fall into your control, distribute as above stated, with substantial equality of justice, between yourself, your brothers and sisters.

"Seventh: I am assigning to Erskine, also, one-sixth of the moneys I expect to receive from Mr. Altschul, upon a trust similar to this in that the principal intention is to secure your mother's future, but I did not wish to join you as co-trustees in a single trust because I do not wish the details of the trust identical. For example, by the terms of his trust he is permitted to use the principal as well as the income, if in his judgment it is necessary for your mother's comfort and happiness, but in this trust with which you are charged I have purposely limited your mother's benefit to the income because I want to feel that there is somewhere some one amount of money which no one shall have a right to diminish, but shall remain intact to earn an income for her benefit, so that whatever else happens she will be sure of this. * * * I thought it better to leave you each independent of the other to follow your own best judgment rather than to tie you up as two trustees in a single trust, in which case if you seriously differed the situation would be awkward. At the same time, there is no objection on my part; indeed, I think it would be desirable, if you cooperated together as any two friends might do in their investments and business management,

and you are each expressly authorized to merge your funds in a common investment or otherwise to carry on a united plan of action if you both agree on the particular steps.

"Eighth: You are authorized to retire from this trust at any time and in so doing to select and appoint your successor; or you are authorized to associate with yourself a co-trustee who shall succeed you in case of your death or retirement; and you are authorized to appoint your successor by your will or other testamentary appointment, and you may name either a person or a corporation; but of course if a person of business wisdom, good judgment and high integrity can be found, I think such an individual would in this case be better than a corporation, because there are so many personal matters and matters in discretion to be attended to. I think Dave Honeyman would be an ideal trustee if he would accept the responsibility, or Drake O'Reilly; but use your own judgment.

"I have written a letter similar to this one to Erskine and will not repeat here what I said to him further than to say as a part of this trust, to guide your judgment, that my idea is not to hoard or accumulate money for either you or your children. Money is only desirable as a bulwark against the storms of fortune to secure the decencies and comforts of life and still leave some leisure for contemplation; for self-development and self-expression, which is what we are here for. I have been in debt ever since I left West Point; largely my own fault; my own bad judgment, and you boys and your children will be even now better off than I ever was, and this comforts me; but it only comforts me because you will have a protection in case of ill-luck or disease and some leisure to grow the spiritual things and to express yourselves, which I have never had; and because I have not had it I know now it is the one thing needful in life.

"I forgot to say that if you choose you may appoint Erskine as a successor to your trust and

he may appoint you as a successor to his, but this will not unite the trusts. They remain as two independent trusts for two slightly different purposes, and if for any reason both trusts should merge in either one of you I would not let it long remain so, but would select an independent trustee to assume one of the trusts.

"* * * I think I have said clearly enough in the conditions of the trust that if at the time of distribution any parent be dead, the children, my grandchildren, are to receive not only the same share and consideration the parent would have received, but perhaps even more because of their loss.

"Again I say in handling this trust always bear in mind that you are my representative in love and affection toward your brothers, your sisters and yourself.

"Your affectionate father,

"(Signed) Charles Erskine Scott Wood.

"P. S.—I forgot to say that if, in your judgment, my purposes to protect any one of the children is best accomplished by either holding their distributive share, or any part thereof, in trust for them, or either or any of them (paying them the income), or by placing their distributive share, or a part thereof, with some other trustee (the income to be paid to them during life, or during a certain period), you are authorized to hold such distributive share, or to place it in trust as above outlined, for the better protection of the individual. By distributive share, I, of course, mean what ought to be allotted to any individual according to the principals stated in this letter.

"(Signed) Charles Erskine Scott Wood."

The instrument which governed the defendant's duties as trustee of the Educational Trust says:

"The general purpose of this trust is to provide in so far as the trust fund will go, for the maintenance, care and education of said three children,

William Maxwell Wood, Berwick Lewis Wood and John Gibbon Wood, and to that end the trustee is hereby authorized and empowered in his absolute and unrestricted discretion to use the income from said fund, and, if he deems it desirable, the principal fund itself, or any part of it, in whatever manner seems to him best for the accomplishment of the aforesaid purpose of this trust. And to that end he is hereby authorized and empowered to invest said sum of $15,000.00 in his discretion in whatever investments commend themselves to his judgment and pay the income therefrom to Myrtle Lewis Wood, the mother of said children, or to whomsoever has the custody of them, or to said children themselves, * * *.

"It is not the intention that said income or principal be divided necessarily equally between said three children, but that it be used by said trustee in whatever way seems to him best for the welfare of all three of them. As each of said children reaches the age of twenty (20) years, said trustee is authorized and empowered, but not obliged, to pay over to him absolutely and freed from this trust, such portion of the trust fund then unexpended, if there be any such, as to the trustee seems a fair share for such child. And the trustee is hereby directed to make such payment before such child reaches the age of twenty-five (25) years.

"The said trustee is hereby relieved from all obligation to account to the beneficiaries of this trust, or to anyone, for any of the trust funds or income therefrom; the provisions above that receipts by the mother or custodian of said children shall fully acquit said trustee, and that having made payments to said mother or custodian, he shall not be further bound to see to the application of said trust funds or income, being merely for the guidance and protection of the trustee, and not obligatory on him, and he is hereby relieved from any duty of accounting whatsoever."

We shall now go to the pleadings. The complaint alleges separately the causes of suit based upon the Wood and the Educational Trust instruments. Our review of the pleadings will omit all averments which pertain to matters that are fully admitted, such as the establishment by Colonel Wood of the trusts and the appointment in the first instance of William Maxwell Wood, Sr., as trustee of the Wood Trust, succeeded upon his death by the appointment of the defendant. Since it is also conceded that the defendant was appointed trustee of the Educational Trust at the time of its creation, we shall omit mention of that averment.

■ The complaint was amended three times; that is, April 24, 1942, July 21, 1943, and December 6, 1943. It was filed March 12, 1942, and since the original answer was not presented until May 11, 1942, the amendment of April 24, 1942, can be deemed of the kind which § 1-1004, O. C. L. A., permits to be made as "of course." Concerning that amendment, counsel for the defendant said: "We have no objection to the amendments, your Honor, if he will give us copies of it."

We come now to the amendment of July 21, 1943. The trial of this cause began February 23, 1943, but when the trial judge discovered that an accounting of two trusts was sought, he urged the parties to authorize the appointment of an accountant charged with the duty of auditing the trustee's records. The desired authority was yielded and Mr. David S. Pattullo, who is both a certified accountant and a competent attorney, was appointed. Thereupon the presentation of evidence was postponed until July 23. On July 21, 1943, while the parties were before the court upon some preliminary matters, the plaintiffs moved for permission to add as parties-plaintiff Erskine Wood, Elisa Wood

Smith and Berwick Bruce Wood. They also moved for permission to make amendments appropriate to the addition of parties. The order authorizing all of this to be done recited:

"The granting of which said motion in all respects is at this time expressly consented and agreed to by the said defendant and his said attorneys in open court."

July 30, 1943, after the trial had commenced, Erskine Wood, after formally explaining to the trial judge why he refrained from becoming a party-plaintiff when the complaint was filed, added that in order "to wind up everything and be binding on everybody" he, together with Elisa Wood Smith and Berwick Bruce Wood, desired to become plaintiffs. Thus he merely stated with his own tongue what plaintiffs' counsel had previously said. The trial judge acquiesced in Mr. Wood's views and plaintiffs' attorney inquired of counsel for the defendant: "You don't object to that?" He received the reply, "No." Thus it is evident that adding the three additional plaintiffs and making the amendments of July 21 twice received the approval of the defendant.

We come now to the amendments of December 6, 1943. They were three in number, short in length, and were made pursuant to leave granted upon the trial court's own motion three months before the entry of the decree. The order accomplished two purposes: (1) it added as parties-defendant the aforemention Nan Wood Honeyman and James McI. Wood, and (2) it authorized the making of the necessary amendments to the complaint. The order itself reads:

"* * * and it now appearing to the satisfaction of the Court that the said Nan Wood Honeyman and the said James McI. Wood, and each of them,

have an interest in the funds which are the subject of the above-entitled suit, and that therefore a complete determination of the controversy herein cannot be had without the presence of said Nan Wood Honeyman and said James McI. Wood and each of them; * * *.''

Thus, the sole purpose was to enable the court to adjudicate the interest of Nan Wood Honeyman and James McI. Wood in the trust funds. We shall later point out the precise amendments that this order authorized.

We shall now review the averments of the complaint which state the cause of suit based upon the Wood Trust. Our review will be of the complaint as thrice amended. It alleges:

(1) Pursuant to the instrument which created the Wood Trust, Colonel Wood paid to his son, William Maxwell, as trustee, large sums of money.

(2) Upon the death of William Maxwell and the appointment of the defendant as successor trustee, all money and securities which had come into the possession of William Maxwell as trustee were delivered to the defendant. Following the latter's appointment, Colonel Wood caused to be paid to him sums of money amounting to more than $90,000 for the Wood Trust.

(3) December 18, 1933, upon the death of Nanny Moale Wood, the defendant was still the trustee of the Wood Trust and there were then living four children of Colonel Wood: Nan, Elisa, Erskine and Berwick Bruce, together with three sons of William Maxwell, deceased.

(4) In 1930, seven years after the death of William Maxwell, Sr., the latter's widow, Myrtle Lewis Wood, married Samuel L. Damon.

(5) February 8, 1934, shortly after the death of Nanny Moale Wood, the defendant, pursuant to the

provisions of the instrument which governed the Wood Trust, distributed approximately $54,000 of its assets among the four children of Colonel Wood. The three children of William Maxwell, deceased, were then 19, 16 and 14 years of age. Nothing was distributed to them.

(6) At the time of the distribution just mentioned the share of the plaintiffs, William Maxwell Wood, Berwick Lewis Wood and John Gibbon Wood, in the securities comprising the Wood Trust was worth $16,000, that being the approximate amount which was given to each of Colonel Wood's four living children in the distribution, and they also had an interest in the assets which remained undistributed.

(7) The defendant "was the confidential advisor, confidential intimate and confidential private agent of said plaintiffs"; he "had long been a very active and exceedingly prominent businessman of the city of Portland." Colonel Wood, at the time of the afore-mentioned distribution of $54,000, was "over eighty years of age."

(8) February 8, 1934, and for a long time both prior thereto and thereafter, the defendant possessed "a very great influence over the said plaintiffs, and each of them, and over the said Myrtle Damon, in relation to all of the private business and affairs of the said plaintiffs, and each of them, and of the said Myrtle Damon."

(9) At the time of the distribution it was agreed between the plaintiffs, Myrtle Damon and the defendant that in so far as the trust instrument pertained to the three sons of William Maxwell, deceased, and to the "money and securities in said trust of the said aggregate amount of $16,000, or to any of said other and further money and securities therein, belonging to and the property of said plaintiffs", the trust should remain

in full force until the three minors should each become 21 years old. It was agreed, according to further averments, that when the youngest had reached that age the trust should cease and the part belonging to the minors should be distributed to them. John Gibbon, the youngest of the three, reached the age of twenty-one October 19, 1940.

(10) Prior to October 19, 1940, when John Gibbon became 21 years of age, the defendant had "wholly failed to account to the said Charles Erskine Scott Wood, the creator of said trust, or to any or either of the other plaintiffs herein, or to said Myrtle Damon, either according to the nature of his said trust, or otherwise, * * * and at all of said times also wholly failed to render to any of said plaintiffs or to said Myrtle Damon an accounting whatsoever of any of his acts or doings in the course of or during his said trusteeship of said trust."

(11) All three of the sons of William Maxwell, deceased, as the defendant knew, were on October 19, 1940, and have been ever since, competent to manage their own affairs and entitled to the immediate possession of their respective shares in the moneys and securities of the trust."

(12) Although it was the defendant's duty on October 19, 1940, to render an accounting of his administration of the trust and to distribute the trust res among the beneficiaries, he failed without justification to render an accounting or to make a distribution.

(13) "Repeatedly" since October 19, 1940, the plaintiffs demanded that the defendant distribute the trust res and render an accounting of his administration of the trusts, but without justification he refused to do either and he "has at all times since the 19th day of October, 1940, wholly failed and refused and still

502

wholly fails and refuses to account to the said plaintiff, Charles Erskine Scott Wood, the creator of said trust, or to any of the other plaintiffs herein or to anyone for any of such moneys, securities, properties or proceeds, either according to the nature of said trust, or otherwise or at all, * * * and likewise has at all times since the said 19th day of October, 1940, wilfully and wrongfully withheld, kept and retained, and still wilfully and wrongfully withholds, keeps and retains in his own possession and custody the said money and securities or the proceeds thereof.''

(14) May 23, 1941, Colonel Wood, pursuant to authority reserved to him by the trust instrument, revoked the defendant's appointment as trustee and notified the defendant to that effect. At the same time Colonel Wood demanded of the defendant that he relinquish all trust records and assets in his possession, but the defendant wrongfully refused to do so.

(15) ''None of the said plaintiffs herein is informed of or knows the amount of the accumulations or increments upon the said moneys, securities, properties and proceeds, or upon any thereof in said trust or the dealings of the said defendant with reference to said trust or any of the details of said defendant's said dealings, and there is no means by which said plaintiffs, or any of them, can ascertain the same except by a discovery and accounting, and therefore, and for the various reasons hereinabove alleged, such discovery and such accounting are necessary and imperative.''

(16) Colonel Wood appointed William Maxwell Wood as successor trustee to complete the closing of the trust.

The cause of suit based upon the Educational Trust repeats all averments of the first cause of suit which set forth the family relationship and which state that

the defendant possessed the confidence of the plaintiffs until after he had refused to make an accounting. It then continues:

(1) Colonel Wood, on March 21, 1923, which was about a year after the death of William Maxwell, Sr., established the Educational Trust for the benefit of the three sons of William Maxwell, Sr.

(2) Colonel Wood appointed as trustee the defendant, who accepted the appointment.

(3) Concurrently with his execution of the trust instrument, Colonel Wood caused to be paid $15,000 of his money to the defendant, in trust for the three minor sons of William Maxwell, deceased. The defendant, as trustee, accepted the fund.

(4) John Gibbon Wood, the youngest of the three sons of William Maxwell, Sr., became 21 years of age October 19, 1940.

(5) Prior to October 19, 1940, the defendant "wholly failed to account or to render any accounting whatsoever to the said plaintiff, Charles Erskine Scott Wood, the creator of said Educational Trust, or to any or either of the other plaintiffs herein, or to the said Myrtle Damon, either according to the nature of his said trust, or otherwise, or at all, for any of the funds in said Educational Trust."

(6) The defendant, prior to October 19, 1940, expended "substantial amounts of money from year to year out of the said funds in said Educational Trust for and toward the education" of the three sons of William Maxwell, deceased, and "by reason of said fact and the said confidential and fiduciary relationship so existing * * * and the said great confidence and trust so reposed by themselves, and each of them, in the said defendant, the said plaintiffs and the said Myrtle

Damon felt no concern at any time prior to the said 19th day of October, 1940, over the said failure of the said defendant, David T. Honeyman, to account or render any accounting for said funds in said Educational Trust."

(7) Since October 19, 1940, the plaintiffs have "repeatedly" demanded an accounting of the defendant of his stewardship of the Educational Trust, but he has "wholly failed and refused, and still wholly fails and refuses to account to the said plaintiff, Charles Erskine Scott Wood, the creator of said Educational Trust, or to any of the other plaintiffs herein, or to anyone, for any of said funds, either according to the nature of his said trust, or otherwise, or at all, and likewise has at all times, wholly failed and refused, and still wholly fails and refuses to render to the said plaintiff, Charles Erskine Scott Wood, the creator of said Educational Trust, or to said plaintiffs, or to anyone, any full, complete, true or accurate accounting of or for his said receipts, disbursements, investments, acts or doings as such trustee of said Educational Trust."

(8) Pursuant to a provision of the trust instrument which reserved to Colonel Wood the power to do so, he revoked the appointment of the defendant as trustee on May 23, 1941.

(9) May 23, 1941, Colonel Wood demanded of the defendant that he "relinquish and turn over forthwith all funds and assets in said Educational Trust and also all documents and books of account and all matters connected with or pertaining to said Educational Trust" but the defendant "arbitrarily, and without any justification, cause or excuse whatsoever therefor, but in a willful, knowing and wrongful breach, abuse and violation of the said confidence and trust so re-

posed in him, has at all times since the said 23rd day of May, 1941, ignored and still ignores, the said revocation of his appointment * * * and still wholly fails and refuses to relinquish or turn over the funds and assets in said Educational Trust or any thereof, or any of the documents or books of account pertaining to said Educational Trust or any matter whatsoever connected with or pertaining to said Educational Trust.''

(10) None of the plaintiffs ''is informed of or knows the amount of funds or assets still remaining in said Educational Trust or the amount of the accumulations or increments upon the same or the dealings of the said defendant with reference to said Educational Trust or any of the details of said defendant's said dealings, and there is no means by which said plaintiffs, or any of them, can ascertain the same except by a discovery and accounting, and, therefore, and for the various reasons hereinbefore alleged in this Complaint, such discovery and such accounting are necessary and imperative.''

(11) Colonel Wood has appointed William Maxwell Wood as successor to the defendant.

As to each trust, the prayer asks that the defendant be removed from his office as trustee; that the plaintiffs be granted a discovery of all of the defendant's transactions; that the defendant be required to make an accounting of his trusteeship; that he be required to relinquish all of his records; that the trusts be dissolved; and that the plaintiffs be given judgment against the defendant for the amounts for which he cannot account.

After Nan Wood Honeyman had been made a defendant in the manner we have mentioned, she joined

with her husband in a demurrer to the complaint which read, in part, as follows:

"Defendants David T. Honeyman and Nan Wood Honeyman demur to the plaintiffs' amended complaint for the following reasons: (1) Said amended complaint does not state facts sufficient to constitute a cause of action; (2) several alleged causes of suit have been improperly united; * * * (6) suit prematurely instituted."

After the demurrer was overruled the two defendants, David T. Honeyman and Nan Wood Honeyman, filed a joint answer. The latter admitted the averments of the complaint concerning the family relationship and that Colonel Wood established both the Wood and the Educational Trust. The answer incorporated within itself the trust instruments governing both trusts.

We shall now turn to the evidence, which, as transcribed, covers 1,100 pages. In addition there are scores of exhibits made up of hundreds of checks, letters, reports and account books. Mr. Pattullo, the accountant who was appointed by the trial judge to audit the defendant's records, submitted two provisional reports before the conclusion of the trial and at its close made a final report, 31 pages in length.

We have bestowed painstaking care upon all of the evidence and have considered with equal care the trial judge's carefully prepared memorandum opinion. We are well satisfied that the trial judge did not misinterpret the evidence that he correctly grasped the facts. The splendid audit of the defendant's books made by Mr. Pattullo and the able memorandum opinion facilitate a recital of the facts.

It will be recalled that the Wood Trust was formed in 1918 and the Educational Trust in 1923. Colonel

Wood, in fact, created two other trusts in 1918. Of one he made his son Erskine trustee. The only substantial difference between that trust and the Wood Trust was the fact that Erskine was permitted to distribute principal to his mother, whereas the defendant, as trustee of the Wood Trust, was not authorized to make distributions to Mrs. Wood of the principal. The trust administered by Erskine is not involved in this suit and his administration of it has been criticized by no one. It is, however, of some evidential value in this suit. The other trust created by Colonel Wood—identified as the Seaman Trust—consisted originally of a fund of $50,000. The trust document which created it was signed by Colonel Wood April 15, 1918, and directed the trustee to:

"pay over the net income directly, and without reservation or condition, to my private secretary, Katherine Beck, for her sole use and benefit so long as she shall live; and if her sister, Emily G. Seaman, should survive her, then after the death of the said Katherine Beck, in like manner to pay over the net income from said principal sum of Fifty Thousand Dollars to the said Emily G. Seaman for her use and benefit so long as she shall live, and on her death, that is to say, on the death of the latest survivor of these two beneficiaries, to distribute said principal sum equally among my five children, as follows: Erskine Wood, Nanny Wood Honeyman, William Maxwell Wood (the trustee herein), Elisa Wood Smith and Berwick Bruce Wood, children's children to take by representation per stirpes and not per capita."

Miss Beck died in 1924 and thereupon her sister, Emily G. Seaman, became the beneficiary. William Maxwell, Sr., was the original trustee of the Seaman Trust, but was succeeded after his death by the defendant. The Seaman Trust is the subject matter of

another suit in which we are writing an opinion concurrently with this one. That trust is material to this appeal only because the Educational Trust, which, as we have seen, was created March 1, 1923, took $15,000 of the Seaman funds and made that sum the trust res of the Educational Trust. This was done by means of a trust document signed March 1, 1923, by Colonel Wood and all of the beneficiaries of the Seaman Trust. It appointed the defendant trustee. As previously said, the event that prompted the creation of the Educational Trust was the death in November, 1921, of William Maxwell and a desire to make provision for the education of his three small sons. It was Miss Seaman herself who suggested that $15,000 of the money held in trust for her be set aside for the education of the three boys.

From the foregoing we see that four trusts were created by Colonel Wood: (1) the Wood Trust; (2) a similar trust administered by Erskine Wood, but which possesses only evidentiary value in this case; (3) the Seaman Trust which is the subject matter of another suit; and (4) the Educational Trust which was created out of $15,000 of the funds of the Seaman Trust. Only the first and the fourth are the subject matter of this suit.

Before his death William Maxwell, Sr., received from Lazard Freres for the Wood Trust $81,000. He invested $77,000 of that money in securities and still had a little more than $4,000 cash in his possession when death overtook him. The defendant became the administrator of William Maxwell's estate. At the conclusion of the administration and upon his appointment to succeed William Maxwell as trustee of the Wood Trust, the defendant received into his possession the aforementioned $4,000 cash and the $77,000 of se-

curities. In his final accounting in the estate of William Maxwell, deceased, the defendant reported that he received directly from Lazard Freres for the Wood Trust $91,412.80 cash. That sum added to $81,000 makes $172,412.80. Thus we know that the defendant received at least that amount of money belonging to the Wood Trust. Erskine Wood testified that in the companion trust which he administered he received from Lazard Freres $182,602.65, being $156,597.23 principal and $26,005.42 interest. Since Colonel Wood assigned to the defendant and Erskine each alike one-sixth of the Lazard Freres money, it is reasonable to conclude that the defendant must also have received $182,602.65. The defendant's books are so incomplete and inaccurate that it is impossible to determine from them how much he received.

In addition to the moneys just mentioned, the defendant received for the Seaman Trust $50,000. Upon the creation of the Educational Trust the Seaman Trust was reduced to $35,000. Obviously, it was the defendant's duty, when the Educational Trust was created, to earmark in some manner $15,000 for that fund and to keep separate records for the trust. But that course was not taken.

The defendant's records, as we have already stated, are incomplete and inaccurate. For instance, Mr. Pattullo's final report to the trial judge says:

"The records kept by Mr. Honeyman were not complete, and were not kept in the manner generally accepted as proper fiduciary accounting. There was evidence submitted at the hearing which would indicate that some of the entries were intended to mislead, such as recording the receipt of dividends on stock of the Pacific Power & Light Company for several years after the stock itself had been sold. * * * It was not possible to obtain all of the in-

formation necessary for a complete checking of the Trustee's statement of December 1, 1942, or for the preparation of an accurate statement of the transactions of the Trustee for the period of his trusteeship. For example, no record was kept by the Trustee of the cash receipts and disbursements of the Wood Trust for 1931 and the Trustee stated on the witness stand that the records of cash receipts and disbursements of the Wood Trust between the beginning of his trusteeship and 1931 were inaccurate and incomplete.''

From the foregoing it is seen that there came into the defendant's hands, as trustee, approximately a quarter of a million dollars.

From 1918 when the Wood and Seaman Trusts were created until the latter part of 1940, Colonel Wood and the beneficiaries of the trusts reposed complete confidence in the defendant. In all of that period of time they never asked him for an accounting and he never rendered one. The defendant was a director and principal officer of the Honeyman Hardware Company, of Portland, which was founded by his father, and the name of which had come to be synonymous of character and success. The relationship between the defendant and the Wood family was affectionate. Colonel Wood, in a deposition, testified:

"He was my son-in-law, and a prominent merchant. I had the greatest confidence in him. In fact, he never did make me any report, and I had such confidence that I never bothered him about it. * * * We had some correspondence, but I never had any report, and I think that I ought to say here that for a very long period, something like eighteen years, I never asked for one; as I've said before, my confidence in Dave was complete. * * * No, the few trips that I made up to Portland, that's right, yes, I chatted with Dave, but he never volunteered

a single explanation or word or report or anything, to give me any knowledge, and I felt a delicacy, here is a prominent man of business and my own son-in-law, and I felt a delicacy about asking him questions, for fear he would misinterpret."

In the latter part of 1940 Colonel Wood, who was then past ninety years of age, wished to conclude the trusts and to relieve the defendant of responsibility of administering them further. The three sons of William Maxwell had by that time passed the age of twenty-one years and hence Colonel Wood believed that there was no longer any reason why the Wood and Educational Trusts should be continued. He wished to have some trust company substituted as trustee of the Seaman Trust and thus relieve the defendant of that responsibility. With these thoughts in mind he wrote to the defendant July 26, 1940, a letter couched in terms of gratitude and friendship, from which we quote the following:

"My dear Dave—I have had enough close calls to warn me to set my house in order without more delay. Erskine has kept me advised as to the trust he has administered * * *. I have never had any information from you as to the condition of the trusts you assumed on Max's death and I would now be glad, at your earliest convenience, if you would tell me in what condition the trusts were when you received them from Max's estate and what distributions you have made and what is the present condition of each of the trusts you now hold."

If Colonel Wood suspected at that time that the defendant had been unfaithful, he made no intimation of it. This letter is a remarkable tribute to the capacity of a man past ninety years of age to think with clarity, to express himself in kindliness and to recall vividly what had transpired a score of years ago. The desired

information was not given, and shortly another letter was written, from which we quote:

"The true way is some sort of simple statement, just showing the facts from the time you took over the various trusts on Max's death to the present time; show what you received from Max, what it consisted in and what you did with it; show how you have invested the trust funds but show it fully, giving facts and figures so that anybody could easily understand the present situation. None of this is any reflection on you. It is a mere matter of every-day business to show how a certain enterprise stands."

The letter, however, failed to obtain the desired information. Some days later Colonel Wood wrote to the defendant again, once more explaining the nature of the information he wished and the purposes which he had in mind. This letter said:

"It seems to me, Dave, that the information I am asking for can reasonably be put into intelligent shape, and I don't want it to be on your shoulders to do it. Can't you employ a professional accountant, turn over to him your books and all records, give him his instructions and let him do the work under your supervision, he to be paid by the trust fund?"

Several more letters of like kind were written. They brought from the defendant nothing but the most meager information. Then Colonel Wood appointed Mr. Walter Asher, a Portland attorney, to secure from the defendant a statement showing the condition of the trusts. Finally, on February 19, 1941, the defendant sent to Colonel Wood three typewritten sheets purporting to be a partial accounting, which he later, as a witness, branded as inaccurate. It developed that Mr. Asher could not secure from the defendant any

information of value and nothing in the nature of an accounting. We quote again from Colonel Wood's letters:

"Dave, writing this letter has been one of the hardest tasks of my life, but life is precious to me now and I must not and will not waste it. I must, therefore, say if you cannot recognize Mr. Asher as my substitute, put there not only to relieve me, but, as I honestly thought, to give you help * * *; then, Dave, I suggest you resign as trustee of your own accord for whatever reason you choose to give * * *. Neither Erskine nor Mr. Asher have ever suggested any wrong-doing on your part, nor do I."

Even that letter brought no report from the defendant, and two months later Colonel Wood informed him that his appointment as trustee was revoked.

Some of the beneficiaries also sought to obtain information from the defendant concerning his administration of the trust and the status of the trust *res*. Their efforts were not as extensive as those of Colonel Wood. They were, however, wholly unsuccessful.

A letter written by the defendant August 16, 1940, in the course of the aforementioned correspondence contained this information:

"Some of these securities are in litigation and a portion is a real estate mortgage which has two years to run."

The statement just made was the first intimation which had come from the defendant that any part of the trust assets consisted of a real estate mortgage, and elicited some inquiries from Colonel Wood which plainly show that he was deceived into thinking that the defendant possessed "a real estate mortgage." In

further correspondence the defendant wrote to Colonel Wood as follows:

"When we divided up our interests the Honeyman Investment Co. became a holding company in which I had no interest whatever, and I still have no financial interest. I accepted two notes for $10,000 and $15,000, together with a mortgage which will expire in about two years. The $15,000 was invested in the Educational Fund and is kept intact, but it was necessary to transfer this as Myrtle demanded money."

Colonel Wood, in reply, stated that he was "absolutely ignorant" about the notes and the defendant's relationship with the Honeyman Investment Company; he inquired:

"Will you please tell me something about the property upon which the mortgage is placed: whether improved property and how improved and the probable value. You see here again I am absolutely in the dark and what I am after now, if this mortgage is really held by the trust fund, is to see if you and I cannot find some way of disposing of it without loss and getting all the trust fund, except the Emily Seaman one, into condition for distribution."

October 11 the defendant replied by saying:

"When the Honeyman boys separated their interests in the Honeyman Hardware Co. and the Honeyman Investment Co., I had no financial interest in the Honeyman Investment Co. When the Honeyman Investment Co. put up a building for the General Electric Co. on the block located at 19th and Vaughn Sts., it was necessary to borrow money and it was then that I made a loan to the company and accepted two notes for $10,000 and $15,000 each. I accepted a mortgage and then later had the property put in my name agreeing to deed the property back upon payment of the mortgage under a contract. Both these notes are endorsed

by T. D. Honeyman and James D. Honeyman individually, as grantors, and I believe has been a good investment.''

Without reviewing further the evidence which shows that the defendant represented that he held a real estate mortgage as security for the $25,000 which he had loaned to the Honeyman Company, we now go into the circumstances which show the nature of the security, if any, which was given to assure the repayment of the loan.

The defendant, as a witness, after swearing that he had no substantial interest in the Honeyman Investment Company, freely admitted that he was an officer and a director of that corporation. Seemingly it is a subsidiary or affiliate of the Honeyman Hardware Company in which the defendant was at all times with which we are concerned a principal officer, stockholder and director. The Honeyman Investment Company maintained no independent records of its own; all of its accounts were entered in the books of the Honeyman Hardware Company. The latter, at about the time when this suit was instituted, was adjudged a bankrupt. The defendant, referring to himself, said, ''I am very, very insolvent.''

December 31, 1919, a corporation entitled the Oregon Planing Mills executed a deed of conveyance to the Honeyman Investment Company which described a parcel of vacant real property situated in Portland to which the witnesses referred as the Vaughn Street property. The deed was not recorded until October 9, 1924. October 1, 1920, the Honeyman Investment Company executed an instrument, which was never recorded, entitled Indenture and Declaration of Trust, in which it acknowledged that it held title to the Vaughn Street property in trust for the Honeyman

Hardware Company. October 7, 1924, the defendant drew two checks payable to the Honeyman Hardware Company, one for $10,000 against Seaman Trust funds and the other for $15,000 against Wood Trust funds. In turn, the defendant accepted from the Honeyman Investment Company two notes, one in the sum of $10,000, and the other in the amount of $15,000, both due two years after date. The payee was David T. Honeyman, Trustee. Concurrently with these events the Honeyman Hardware Company assigned to the defendant, as trustee, the Indenture and Declaration of Trust. The assignment, like the indenture itself, was never recorded. Thus, when the $25,000 of trust funds was paid to the Honeyman Hardware Company the trusts had as security nothing but the unrecorded Indenture and Declaration of Trust which described vacant property. The notes were not paid when they became due and were renewed. The renewals named as payee the defendant individually. February 15, 1928, the Honeyman Investment Company executed a deed to the Vaughn Street property which named as grantee the defendant individually and which recited that the title was ''free from all encumbrances.'' A month and a half later the defendants, David T. and Nan Wood Honeyman, as husband and wife, executed a mortgage which described the Vaughn Street property and which named an insurance company as mortgagee. It secured payment of a note for $50,000 signed by the two Honeymans and payable to the insurance company ten years after date. It was promptly recorded. Thus, if the Indenture and Declaration of Trust, or the deed of February 15, 1928, constituted security for the payment of the loan of $25,000, the security was secondary to the $50,000 loan which we have just mentioned. It seems reasonable to infer that

the deed of February 15, 1928, which named the defendant as grantee and which recited that the title was "free from all encumbrances", was intended to facilitate the insurance company loan. The loan of $50,000 made by the insurance company enabled the Honeymans to improve the land with a building. The value of the property is not indicated in the records. After the building had been constructed the General Electric Company became lessee of the property, and we observe that later this lease was assigned to the insurance company as additional security for the note which it held. The note was payable March 30, 1938. March 23, 1938, a partial satisfaction was entered of the $50,000 mortgage and a new one was executed by the Honeymans to the insurance company, this time in the sum of $32,000. October 25, 1937, the defendant sold securities held by him as trustee which yielded $26,615.50. All of that money was deposited in his personal bank account and none of it was ever reinvested for the trust accounts; nor was any of it, so far as can be learned, transferred from the defendant's private account to a trust account. The plaintiffs suggest that the $18,000 which the defendant paid March 23, 1938, upon the insurance company mortgage came from this fund of $26,615.50. The defendant did not refute the claim.

Although at the outset the defendant correctly entered the interest which he received from the Honeyman Hardware Company, later he changed his course. In the Seaman Trust, which held the $15,000 note, we find in the defendant's books beginning with 1937 the following entry: "4% on $13,712.10, 3 months, $137.12." Mr. Pattullo inferred that that entry, which reoccurred every three months beginning with 1937, represented interest on the $15,000 six per cent. note.

Before relating further the matters pertaining to the $25,000 loan, we shall mention other incidents. In all of this period nothing appeared upon the public records indicating that the defendant, as trustee, had any interest in the Vaughn Street property or that the latter in any way constituted security for the $25,000.

December 18, 1933, Nanny Moale Wood died. The trust letter quoted upon a preceding page says:

> "At your mother's death this trust is to cease * * *. All such moneys, properties or proceeds as you may have in your hands or under your control in this trust shall at your mother's death, * * * be divided among yourself and your brothers and sisters, as soon as conveniently may be, but not necessarily equally."

When the defendant became trustee those instructions became controlling upon him. Following the death of Mrs. Wood the family had a meeting in the course of which it was decided that both the defendant and Erskine Wood should make partial distribution of the trust assets which were in their possession. So far as the defendant was concerned, the agreement pertained only to the Wood trust; the other two which he was administering were unaffected by the death of Mrs. Wood. By the distribution agreement it was agreed that Erskine and the defendant should each distribute to Lisa $16,000, to Berwick Bruce approximately $20,000, and to Nan and Erskine each approximately $12,000. It was also agreed that, since none of the three sons of William Maxwell, deceased, had yet reached the age of twenty-one years, there should be placed in trust for them by both the defendant and Erskine the sums which would have been distributed to William Maxwell had he lived; that is $16,000 from

each trust, or a total of $32,000. Erskine promptly complied with the agreement in its entirety and in so doing transferred to a trust company securities worth $16,000 or more for the three sons of his deceased brother. Since the partial distribution he has added other sums so that the amount in trust for the boys at the time of the trial was $20,000. The defendant, however, opened no separate trust account for the boys' $16,000 distributive share. He neither delivered $16,000 worth of securities to the boys nor to another trustee, nor did he segregate for them any part of the assets in his possession. Likewise, in his records he made no entries indicating that anything in the form of principal or income had been earmarked for the boys as a result of the understanding concerning the distribution. The value of all the assets remaining in the Wood Trust at the time of the trial was only $5,698.95.

We shall omit further mention of the distribution except to describe what the defendant did in regard to payment of Lisa's share. It will be recalled that she was entitled to receive $16,000 of the trust assets. The defendant sent to her securities of the value of $6,000 and the $10,000 Honeyman note. In sending the latter to her he left unmentioned the questionable character of the security which stood back of the note, and said nothing whatever about the $50,000 mortgage which encumbered the property. May 6, 1936, when the note became due the defendant sought from Lisa an extension of time for payment. Although his letter stated, "I invested $25,000 with the Honeyman Investment Company, which property is deeded in trust to me as security," he again failed to disclose the existence of the $50,000 mortgage which was a first lien upon the property. The letter described the invest-

ment as "very fortunate", and added, "There is no question about the security which I hold." The requested extension was given, but April 1, 1941, when the extended time had expired, the note still remained unpaid. Lisa thereupon insisted upon payment and, finally, received two postdated checks totaling $5,000 which were paid at the postdated times, that is, in December, 1941. In that way $5,000 of the $10,000 obligation was discharged. Shortly Lisa became insistent upon payment of the balance. Before stating what then happened we mention another circumstance. The present suit was instituted in January, 1942. May 1, 1942, the defendant submitted to the plaintiffs some sheets prepared by himself which purported to show stocks and bonds belonging to the Wood Trust which he had sold and others which were still on hand. Among securities which he listed as still in his possession were some shares of the capital stock of the United States National Bank. May 1, 1942, he sent a certificate for fifty-seven shares of that stock to Lisa in part satisfaction of the $10,000 note. His letter stated:

"Enclosed find stock certificate No. 11889 for 57 shares in the U. S. National Bank, together with power of attorney which is dated February, 1936. The present market is around forty * * * ."

Not knowing that the certificate just described was, in fact, trust assets, and believing that it belonged to the defendant individually, Lisa accepted the certificate and sold the stock for $1,995 which she credited upon the balance of $5,000 due upon the $10,000 note. The defendant's letter also said:

"It is necessary to write for information regarding the Central Coal & Coke bonds and I will send later. I would suggest that you hold these as security for the present and I will adjust interest later. The numbers are as follows * * * ."

For some reason which has not been disclosed the defendant did not send to Lisa the Central Coal & Coke Company bonds. They possessed a par value of $2,500. They belonged, not to the defendant, but to the Wood Trust. When the defendant's attention was directed to those bonds, he conceded that they "did not belong to me. They belonged to the trust." It will be recalled that this suit was instituted in January of 1942. In December of that year the defendant prepared and filed a document, dated December 1, 1942, which he entitled "Statement of Mrs. C. E. S. Wood, Kathryn Beck and Miss E. G. Seaman Trusts." One of its pages was captioned "List of Securities on Hand, Wood Trust." Under that heading he included "Central Coal & Coke, $2,500 bonds." Four months previously, that is, four months before that statement was prepared and filed, the defendant had sold those bonds for $2,541.20, which he deposited in his personal bank account and checked out in ordinary routine. Thus, three months after he planned to send those bonds to Lisa to satisfy her demands, he sold them and pocketed the money. Immediately prior to his sale of those bonds he had an overdraft of $30.67 in the bank account in which he deposited the proceeds of the sale.

We revert to the $10,000 note. In the aforementioned statement which the defendant sent to Colonel Wood February 19, 1941, he entered the $10,000 note as still on hand. As a witness, he conceded that the note had not been a trust asset for several years prior to 1941, and in that respect, as well as in others, the statement of February 19, 1941, was false. The Trustee in Bankruptcy of the Honeyman Hardware Company testified that the records of the bankrupt indicate that both the $10,000 and the $15,000 notes

were paid to the defendant. Any effort to enforce their payment will be resisted by the Trustee in Bankruptcy and the defendant's brothers, whose names appear upon the note as endorsers.

We have mentioned the fact that on February 19, 1941, Colonel Wood, after repeatedly importuning the defendant for information concerning the condition of the trusts, received from him three typewritten sheets which purported to give information. One of these sheets reads as follows:

```
 "2-18-41
 List of Securities on Hand
 Illinois Central R. R. Co. __$2,000.00
 Oregon & Washington
 R. R. Co. _____ 2,000.00
 Jersey Central Power _____ 2,000.00
 American Superpower
 Corp. _____ 5,000.00 $11,000.00
 Interest in Real Estate
 Investment approxi-
 mately_____ 10,000.00
 _____
 $21,000.00"
```

The defendant freely conceded upon the trial that he transferred the Illinois Central and the Oregon & Washington Railroad bonds mentioned in the above list to Lisa as a part of the $6,000 in securities, which he distributed following the death of Mrs. Wood in 1933. He also conceded that, as a part of the same distribution, he transferred to his wife the two Jersey Central Power bonds likewise set forth in the list just quoted. The last item on the list, "Interest in Real Estate Investment approximately $10,000.00", according to the defendant, referred to the $10,000 Honeyman note which he had transferred to Lisa as a part of the distribution. Thus, the statement just quoted was erroneous to the extent of $16,000. Before

leaving this subject we quote the following from the defendant's testimony:

"Q. So your list of securities on hand you furnished Col. Wood was wrong to the extent of $16,000?

"A. I would say so."

Hence, the only item which he possessed at the time the list was submitted was the American Superpower Corporation bonds having a par value of $5,000. October 15, 1942, when his personal bank account was overdrawn to the extent of $74.03, the defendant sold the security just mentioned for $2,511.95 and deposited that amount in his personal bank account. He checked out the $2,511.95, after satisfying the overdraft, in the normal routine of his expenditures. Hence, nothing is left from the list for the purposes of the trust.

We now revert to the several sheets, dated December 1, 1942, and entitled "Statement of Mrs. C. E. S. Wood, Kathryn Beck and Miss E. G. Seaman Trusts", which the defendant submitted in the nature of an accounting. It will be recalled that it was filed eleven months after this suit was instituted. Two of its pages follow:

"List of Securities on Hand—
Wood Trust

| | | |
|---|---|---|
| American Superpower Corp | $5,000.00 | Bonds |
| Broadway Bldg. | 3,000.00 | " |
| Botany Consolidated Mills | 2,000.00 | " |
| Central Coal & Coke | 2,500.00 | " |
| Republic of Chile | 1,000.00 | " |
| B. F. Schlessinger | 1,000.00 | " |
| " | 5,000.00 | Stock |
| Sutter Basin | 1,000.00 | Bonds |
| Union Rock Co. | 2,000.00 | " |
| Portland Paramount | 5,000.00 | " |
| Republic of Chile | 4,000.00 | " |

$31,500.00"

524

"List of Securities on Hand—
Seaman-Beck Trust

| | | |
|---|---|---|
| Honeyman Investment Co. | $15,000.00 | Note-Mtg. |
| Portland Gas & Coke Co. | 6,500.00 | Preferred Stock |
| Pacific Power & Light | 3,500.00 | ,, ,, |
| Boston Ins. Exch. Bldg. | 2,000.00 | Bond |
| Lincoln Bldg. | 3,000.00 | ,, |
| Cash | 2,460.00 | |

$32,460.00"

We have already shown that the defendant sold the bonds of the Central Coal & Coke Company, with a par value of $2,500, on July 30, 1942, four months before he wrote the sheet just quoted. We also showed that he sold the bonds of American Superpower Corporation, with a par value of $5,000, on October 15, 1942, for $2,511.95. March 22, 1943, one month after the trial was commenced, the defendant sold the bonds of the Union Rock Company, having a par value of $2,000, for $814.00. At that time his personal account, into which the proceeds of the bonds were deposited, had an overdraft of $119.51.

By glancing at the statement headed List of Securities on Hand, Seaman-Beck Trust, it will be seen that the plaintiff indicated that he possessed cash amounting to $2,460.00. Mr. Pattullo was unable to find that cash, and the defendant virtually conceded its nonexistence. It will also be seen that the list is headed with the Honeyman $15,000 note. It appears from the record that any attempt to enforce payment of that obligation will be resisted, not only by the Trustee in Bankruptcy of the Honeyman Hardware Company,

but also by the defendant's two brothers. Payment will be the defense which will be invoked.

There appear upon that part of the above list which pertains to the Seaman-Beck Trust the two following items:

Portland Gas & Coke
Company ........................$6,500 Preferred Stock
Pacific Power & Light
Company ..................... 3,500 ,, ,,

The defendant made both purchases in 1923. As the trial advanced and the plaintiffs discovered that the defendant had sold during the trial, for his personal benefit, several bonds, they became anxious that the certificates for these two issues be produced in the courtroom so as to protect them from sale. When the defendant was asked whether he could produce these certificates he readily replied in the affirmative and explained that they "were covered up because they were in my name and I was very much afraid that the Federal Court was going to get after me for those stocks, which were trust stocks." A day or two later he changed his explanation and claimed that both certificates were in "my safety deposit box." Upon his next appearance on the witness stand he swore that the $6,500 of Gas Company stock was part of a certificate amounting to $10,000, $3,500 of which belonged to his children, and that the Pacific Power & Light Company stock was likewise part of a larger certificate belonging, in part, to his children. Having made these statements, he explained that both of the certificates were in the companies' offices and were being reissued so that the part belonging to his children could be given to them. He promised to produce shortly the reissued certificates. The next time the defendant was examined he made no claims

that the certificates were in process of reissue, but said that both reposed in his wife's safety deposit box. He again promised to produce them and when the appointed time arrived he again changed his story. This time he insisted that upon some previous occasion he made up a bundle of securities, including these two certificates, and gave it to his wife. According to him, Mrs. Honeyman kept the bundle at a place unknown to him. By this time the whereabouts of the certificates was a matter of keen interest and the trial judge himself now asked many questions upon the subject. No one doubted that the certificates still existed, and all assumed that Mrs. Honeyman could produce them. The defendant claimed that she was in Clatsop County at a place or places which he described in variable language. At this juncture efforts were made to communicate with Mrs. Honeyman so that she would appear at the trial. The efforts failed and thereupon a subpoena, together with the required witness fees and mileage, were sent to the sheriff of Clatsop County with instructions that he serve Mrs. Honeyman. After several telephone conversations had been had with the sheriff he finally replied that, notwithstanding all of his efforts, he had been unable to locate Mrs. Honeyman and returned the subpoena. It seems desirable to recall a fact which we have previously mentioned; that is, that the defendant regularly sent to Miss Seaman checks for amounts which he claimed were dividends earned by these two stock issues. The defendant positively swore that the dividends were regularly paid to him and stoutly maintained that he had recently received dividend checks upon these stock issues, one in the amount of $57.20 and the other in the sum of $61.25. When a court order was made enjoining him from

parting with any further trust assets, he protested that Miss Seaman needed these dividend checks. He also swore that in recent years he had traded heavily in the securities of both of these companies. After the defendant had given all of the above explanations he changed his version again; this time he swore that he had sent the certificates to a transfer agent in New York City and that so far as he knew both certificates were in New York. His explanation as to the identity of the person and the time when the certificates were sent was confusing. One of the certificates, he said, had been in New York for several years. At this point the attorney for Miss Seaman had seemingly come into possession of information concerning the two certificates and called to the witness stand a Mr. Platt, who was secretary of the Portland Gas & Coke Company, and later a Mr. Hawkins, secretary of the Pacific Power & Light Company. It then developed from the sworn uncontradicted testimony of these two men that the defendant had sold both of the certificates in 1932. The purchaser in each instance was the issuing company itself and the purchase price check was made to the defendant. Since 1932 the defendant owned no stock in either company, individually or in any other capacity. Both of the aforementioned witnesses swore that no dividend check had been issued to the defendant since he sold the certificates in 1932. Thus, it developed that explanations concerning the whereabouts of these two certificates, which, as transcribed, cover virtually reams of typewritten pages, were false. They clearly show that the defendant can not be depended upon as a source of the truth. The report, dated December 1, 1942, which he filed with the court and which

listed both of these issues as still "on hand", was glaringly false in that detail as well as in others.

We have said that the remaining assets of the Wood Trust possess a market value of $5,698.95. If the $15,000 Honeyman note is disregarded—and surely its value, if any, is meager—the assets remaining in the Seaman Trust are worth $480.00.

In the period 1933 to 1938 the defendant received from the sale of securities belonging to the trusts more than $35,000, all of which was applied by him toward the discharge of personal indebtedness which he had incurred at a bank. Since 1930 the defendant sold securities possessing a value of $68,000 or more and deposited the proceeds in his personal bank account. Since that time he invested no more than one thousand dollars for the trusts. The transaction concerning the thousand dollars may not have been an investment. Thus, at least $67,000 came into the defendant's possession since 1930, no part of which was either reinvested or transferred to any trust account.

January 19, 1931, Colonel Wood wrote the following letter to both Erskine and the defendant:

"My dear Erskine and Dave:

For convenience I address you by the same letter, and severally as Trustees for the fund I created, the income of which is payable to Erskine's mother.

I have no further power over this Trust, as the intent was to make it absolute for the purposes named, and beyond my own control; but in order that the Trust may be interpreted according to my intentions, in case any need for interpretation should arise, I wish to say that I purposely put no restraint or qualification on the Trustees as to the character of their investments.

As a lawyer, I had seen so many disadvantages in holding trustees to any particular line of invest-

ment, that I felt in this case, and with trustees selected by myself, and with such successors as they were certain to have, I preferred and thought it really better for the Trust, to leave them absolutely freehanded in their investments; and I am still of the opinion that under all the circumstances this was a wise policy. Anyhow, for what it may be worth, it was my deliberate intention.

It is hardly necessary for me to say it was never my intention that the Trustees, or either of them, should ever be held to any personal liability for loss. When I contemplated a perfectly free hand for the Trustees, I naturally contemplated the possibility of loss, as well as the possibility of gain. But I never would have put upon anyone's shoulders the responsibility of a trust that with one intention gave a perfect liberty for investment, and with another intention made the trustees absolute insurers and guarantors of their investments. That would be unjust and absurd, and I need not say was never within my contemplation.

As I have no further control over the trusts, my personal opinion is probably of no value; but I will say that, had I been a little more forethoughted I would have put in a provision that, while Erskine's mother was to have the absolute benefit of the entire income, if necessary for her comfortable maintenance, yet, after she had freely taken, according to her own wish, all that was needed for her own use, if there remained a surplus of income, I would have added that surplus to the principal sum, and especially to cover any losses that might be made through the investments selected by the Trustees, or either of them.

These trusts are purely a family matter, and it would be my wish that they be not administered or construed with all the strictness of the law of trusts, as applied generally, but so as to accomplish my intention, namely; to preserve a fund irreducible so far as possible, which, after Erskine's mother was through with the benefit from its income, could,

as an undiminished sum, be distributed according to the provisions of the Trust.

Charles Erskine Scott Wood
(C. E. S. Wood)''

Erskine Wood, referring to the letter just quoted, swore that the circumstances which induced his father to write it were:

''Now, the reason that letter was written is this: I was down at Los Gatos visiting my father. You will notice the date, 1931, which was in the depth of the depression and the securities that I have invested in, being in part stocks, preferred stocks or common stocks, had depreciated in value and I didn't want any future beneficiary of the trust ever to think that we had been, that we trustees had been required by my father to invest these securities only in such bonds and securities as are by statute made available for investments by trust companies, and I explained that to my father, and that, due to the going-off of the market, we had suffered some losses and asked him to write this letter to clarify that situation. I didn't want to protect myself without protecting Mr. Honeyman at the same time, so I asked my father to include him. That is the only way that letter was ever written, or was ever intended.''

Colonel Wood, referring to the same letter, gave the following explanation:

''I could make my own interpretation. I think it's really for the judge to make it from the language I used, but I would say, just as I've been saying to Mr. Dezendorf, that I would ask a court of equity to assume that my language was that of a man of mature years and with some training in the law, and that when I said they were not to be fettered, I meant they were not to be fettered by such rules as no other securities but gilt-edged bonds, I wanted to release them from that, so I

wanted to release them from any other arbitrary bonds that bound them as against their own best judgment, their tried judgment, their investigation, and their knowledge. I will say here I would have contempt for the judge who would take that letter of mine and would say that that fully justifies a man to take these funds trusted to him and invest them, not even for my daughter, his wife, not even for anybody connected with me, or where they would do any good, but to take those sacred funds, and he ought to have felt the sacredness of the trust, and hand over $10,000.00 in speculation to Tom, $15,000.00 in speculation to Jim, $10,000.00 in speculation, pure speculation, to himself, and what is the proof today? Every Goddamned one of those bonds are now stinking with default, five years extension deliberately made by him to avoid what I might do deliberately made, I should have something to say to indict Dave Honeyman, not only with embezzlement, but with absolute willful and deliberate frauds. I may come up and talk yet.''

We shall pursue the evidence no further. The decree of the circuit court holds that the defendant ''wrongfully and unlawfully converted to his own use the sum of $107,859.54'', assets of the Wood Trust, and the sum of $730.63, belonging to the Educational Trust. In determining those amounts the circuit court gave the defendant full credit for everything into which he had put money, whether the investment was lawful or otherwise, and whether the security purchased went into default or held its value. In other words, nothing was counted against him except sums which he converted to his own use. The totals of $730.63 and $107,859.54 are made up entirely of amounts which the court found he had converted to his own use. They were based upon computations made by Mr. Pattullo, and we are satisfied that they are correct.

532

We now come to the assignments of error. The first and the second challenge the sufficiency of the summons and invoke the aid of §§ 9-801 to 9-817, O. C. L. A., which became a part of our laws through the enactment of General Laws of Oregon, 1917, chapter 198. Section 9-801 says:

"When any trust in real or personal property, or both, shall have heretofore been created, * * * and the trustee or trusteees of such trust, or any person interested in said trust or any person interested in the property embraced in said trust * * * shall deem it for the interest of all persons who are or may become interested in said property that the same or any part thereof should be sold, mortgaged, improved, exchanged or leased; or otherwise dealt with in any other manner, such party or parties may commence a suit for the purpose of obtaining a decree for the sale, * * *. Any court of equity in a county in which any of such trust property may be situated shall have jurisdiction to hear the cause of suit and enter the proper decree."

Section 9-803 provides:

"The summons in said suit shall be in the usual form, and in addition it shall contain the following notice as and for 'the succinct statement of the relief demanded,' which is required by section 1-606; 'The object of this suit is to obtain a decree authorizing the trustees of the trust set forth in the complaint herein to sell, mortgage, lease, exchange, improve or otherwise deal with the property embraced in said trust, in accordance with the prayer of said complaint.'"

Section 9-806, which delineates the power of the court in suits of the kind which these sections authorize, says:

"The court in said suit shall have jurisdiction to authorize said trustee or trustees to sell, mort-

gage, lease, improve, exchange or otherwise deal with said property, or any part thereof, * * * to enable the trustees to deal with the trust property or funds with all the powers of owners, keeping in view the full protection of the interests of all persons, living or unborn, in the property embraced in said trust.''

Section 9-816 says:

''The remedy provided by this act is cumulative, and shall not be construed as limiting or abrogating any inherent power of a court of equity, including the inherent power to authorize the sale, mortgage, exchanging, improving or leasing of or otherwise dealing with trust property, or as in any manner limiting any lawful power, express or implied, conferred upon such trustee or trustees by the will, deed or other instrument creating such trust, to sell, mortgage, exchange, improve or lease or otherwise deal with said trust property, or any part thereof.''

Section 9-817, which was § 17 of the 1917 Act, requires any person, other than a trustee, who institutes a proceeding under the 1917 Act to file, contemporaneously with the institution of proceedings, an undertaking. The section provides that if the plaintiff, other than a trustee, is unsuccessful, the court shall tax the costs, disbursements and a reasonable attorney's fee against him and the surety.

The appellants do not contend that the summons which was employed in this suit was not ''in the usual form,'' but point out that it did not contain a ''succinct statement of the relief demanded'' and the words ''the object of this suit is to obtain a decree authorizing the trustees * * *.'' It is obvious that if the statute upon which the appellants rely is applicable to this suit, and if the summons in this suit contained the

words "the object of this suit is to obtain a decree authorizing the trustees of the trust set forth in the complaint herein to sell, mortgage, lease, exchange, improve or otherwise deal with the property embraced in said trust," the defendants could readily have been misled. The purpose of the suit was not to confer any authority whatever upon the defendant, David T. Honeyman. The plaintiffs wished him to do nothing further concerning the trust or the trust res. To the contrary, the purpose of this suit was to oust him from his office as trustee. As ancillary relief the complaint sought an accounting from the defendant, judgment against him for all sums for which he could not account and the appointment of a successor trustee.

■ Section 9-801, O. C. L. A., which defines the circumstances under which a suit of this kind may be instituted, and § 9-806, which delineates the authority vested in the court by the 1917 Act, both state that the purpose of the act is to authorize a court to empower a trustee to deal with the trust property as, for instance, to sell, mortgage or improve it. The court is authorized to grant the trustee such authority, "whether such power is or is not given to such trustee or trustees in the instrument creating such trust." Further, the act authorizes the court to empower the trustee to use the proceeds of a sale, mortgage or lease for the following purposes: (a) improvement of the trust property; (b) the discharge of liens; and (c) reinvestment in other property. Manifestly, the plaintiffs wished to have the defendant empowered with no such authority. To the contrary, they wished him stripped of all authority and discharged from his office as trustee. It is obvious that the statute upon which the appellants rely is not applicable to this suit.

■■ Again, § 9-816 says that the remedy given by the 1917 statute is cumulative. A cumulative remedy is an additional one. All existing remedies remain in full force and effect when a statute is enacted affording a cumulative one. The additional one does not negative nor abrogate existing remedies: 10 Words and Phrases, Cumulative Remedy, § 662. Section 9-816 itself expressly so provides by saying that the remedy provided by this act "shall not be construed as limiting or abrogating any inherent power of a court of equity" to proceed as hitherto. We are satisfied that this proceeding was not instituted under the act upon which the appellants rely, and are likewise satisfied that that act is not applicable to a proceeding of the kind which we are reviewing. It follows, therefore, that, in our opinion, it was not necessary for the summons to contain the words quoted in § 9-803; nor was it necessary for the plaintiffs to file the bond required by § 9-817. The first two assignments of error, we think, possess no merit.

The third assignment of error follows:

"Court never acquired jurisdiction as all beneficiaries of trusts were not made parties to suit, either as plaintiffs or as defendants."

The sole authority submitted in support of this assignment of error is § 9-802, O. C. L. A. The reply brief, after quoting that section of our laws, says:

"* * * a void judgment can be set aside and the record purged at any time."

In support of that statement, the brief cites five decisions. The soundness of that rule is so obvious that no citation to authority was necessary. The question remains, however, whether the principle has any application to the issues before us. It is sufficient to dispose

of this assginment of error to repeat that the 1917 Act, of which § 9-802 was a part, is not applicable to this suit, but before finally closing the matter we shall consider the fourth assignment of error, which follows:

"Court is powerless to authorize amendments to complaint after trial, nor can it bring in new parties without issuing alias summons and amended complaint, giving such new party the usual time allowed by statute to original parties in which to answer. And it was error to bring in Nan Wood Honeyman contra to law as was done in both suits."

In support of that statement, the appellants cite: § 1-1006, O. C. L. A.; *White v. Johnson,* 27 Or. 282, 40 P. 511, 50 Am. St. Rep. 726; *Scott v. Ford,* 52 Or. 288, 97 P. 99; *Western Land & Irrigation Co. v. Humfeld,* 114 Or. 53, 234 P. 796; *Walters v. Dock Commission,* 126 Or. 487, 266 P. 634, 270 P. 778; and *Enterprise Irrigation District v. Enterprise Co.,* 137 Or. 468, 300 P. 507.

We shall now analyze the above contentions. Specifically our purpose will be to determine whether error was committed by the entry of the orders which per- mitted the complaint to be amended and which directed that Mrs. Honeyman and James McI. Wood be made defendants. The complaint was amended on three occasions: once before the answer was filed, again on the eve of the trial, and a third time when the last witness was stepping from the witness stand.

■ In a preceding paragraph we described the first and second amendments (made respectively on April 24, 1942, and July 21, 1943) and showed that no error was committed when they were allowed. Nothing need be added, we think, to what is there said, and therefore we go on to the third group of amendments, that is,

the ones which were made December 6, 1943, after the last witness had testified, but three months before the decree was signed.

The amendments made on December 6 were three in number and had the effect of adding as defendants Mrs. Honeyman and James McI. Wood and adding two sentences to the complaint. The first of these three amendments did nothing more than insert into the title the names of Mrs. Honeyman and James McI. Wood as defendants. The second (December 6) added a sentence to the complaint designated as Xa, reading as follows:

> "By virtue of said instrument in writing dated the said 15th day of April, 1918, creating and establishing said trust, the said defendants, Nan Wood Honeyman and James McI. Wood, who is a brother of the said plaintiff, Charles Erskine Scott Wood, each have an interest in the funds which are the subject of the above entitled suit, and the said respective interests of said defendants, Nan Wood Honeyman and said James McI. Wood, in said funds should each be adjudicated and determined in the above entitled proceeding."

Those words added nothing new to the case. The trust instrument governing the Wood Trust was a part of the answer which the defendant had filed and itself contained the very information conveyed by the words just quoted. As said in a preceding paragraph, the trial judge, upon his own volition, directed that Mrs. Honeyman and James McI. Wood be made defendants for the very purpose which was reiterated in the amendment just quoted.

■ The third division of the amendment of December 6 pertained exclusively to the prayer of the complaint and added to it the following:

> "That the interests of each of the said defend-

ants, Nan Wood Honeyman and James McI. Wood therein be adjudicated and determined.''

Just before Mrs. Honeyman was made a party defendant she had appeared upon the witness stand and had given testimony which indicated that she claimed an interest in the remaining assets of the trusts. Section 1-315, O. C. L. A., says:

> ''The court may determine any controversy between parties before it, when it can be done * * *; but when a complete determination of the controversy cannot be had without the presence of other parties, the court shall cause them to be brought in.''

It is evident from the record that when the trial judge directed that Mrs. Honeyman and James McI. Wood be made defendants the ruling was prompted by the section of our laws just quoted. Mrs. Honeyman was an indispensable party, and it was the duty of the trial judge to take the course which he adopted: *Wheeler v. Lack,* 37 Or. 238, 61 P. 849.

The above amendments, that is, Paragraph Xa and the provision which was added to the prayer, are so simple that we do not believe that the appellants challenge their regularity, provided the court was authorized to add as parties-defendant Nan Wood Honeyman and James McI. Wood. We are satisfied that no error was committed when these two amendments were permitted, if the addition of Mr. Wood and Mrs. Honeyman was permissible. As we have indicated, James McI. Wood is not an appellant. He filed an answer which admitted every averment of the complaint and which asked for nothing for himself. The sole purpose for which he and Mrs. Honeyman were made defendants was to enable the court to adjudicate their interests in the remaining assets of the trusts.

It is urged with great insistence that error was committed when James McI. Wood and the appellant, Mrs. Honeyman, were made defendants. Since the addition of James McI. Wood in no wise prejudiced the appellants, we shall confine our inquiry to the question as to whether or not error was committed when Mrs. Honeyman was made a defendant. We will now consider that question and in so doing will consider the authorities submitted by the appellants.

Section 1-1006, O. C. L. A., says:

> "The court may, at any time before trial, in furtherance of justice, and upon such terms as may be proper, allow any pleading or proceeding to be amended by adding the names of a party, or other allegation material to the cause; and in like manner and for like reasons, it may, at any time before the cause is submitted, allow such pleading or proceeding to be amended by striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect * * *."

*White v. Johnson,* supra, reversed a judgment of the circuit court which was entered against one Cordelia Johnson, who was not a party-defendant when the original complaint was filed, whose name was never entered in the summons and whose only appearance in the action was a special one limited to the single purpose of challenging the service. The latter consisted of serving upon Cordelia Johnson a summons which did not contain her name and which was not directed to her. Since she made no general appearance, she was in a position to take advantage of the defect in the service.

*Scott v. Ford,* supra, reversed a judgment of the circuit court which was entered after the following course had been pursued: (1) a trial in the circuit court

which resulted in a judgment for the plaintiff; (2) an appeal to this court; (3) a reversal of the attacked judgment; (4) a second trial in the circuit court; (5) the entry of findings of fact and conclusions of law at the end of the trial; (6) the entry, upon motion of the trial judge himself, of an order which awarded a new trial; (7) the entry of an order permitting the plaintiff to file an amended complaint; (8) a trial based upon the amended complaint; (9) a judgment for the plaintiff; and (10) an appeal to this court by the defendant. In reversing the judgment (for the plaintiff) this court held that the circuit court, after having entered findings of fact and conclusions of law, possessed no power to award a new trial upon its own motion so that the plaintiff could amend his complaint. It likened the findings of fact to the verdict of a jury.

In *Western Land & Irrigation Co. v. Humfeld,* supra, it appeared that after suit was commenced a trust deed executed by the plaintiff was foreclosed and all of the plaintiffs' property was sold at foreclosure sale to a third party, who afterward sold it to the Western Irrigation Company, an Ohio corporation. The latter and the plaintiff were two separate entities unrelated to each other. Later, upon motion of the plaintiff, an order was entered which purported to substitute the Western Irrigation Company for the original plaintiff. That order was never served upon the Western Irrigation Company, nor was any other kind of process served upon it. The Western Irrigation Company never appeared in the suit. Later, after a decree had been entered against one of the defendants and he had given notice of appeal, the Western Irrigation Company moved to dismiss the appeal on the ground that no process of any kind was ever served

upon it, and that it had not appeared in the suit. In sustaining the motion, this court said:

> "No person or corporation can involuntarily be made a party to a litigation unless duly served with summons or its equivalent. * * * The Western Irrigation Company could not be made a party to the pending litigation without being properly served as is clearly pointed out in White v. Johnson, above, unless that company voluntarily appeared which it has not done."

In *Walters v. Dock Commission,* supra, the plaintiffs secured a judgment against the Dock Commission of the City of Portland which was affirmed by this court. When collection of the judgment was sought it developed that there was no corporate entity entitled The Dock Commission of the City of Portland. At that juncture the plaintiff moved this court to amend the title of the cause so that the name of the judgment debtor would no longer appear as The Dock Commission of the City of Portland but as The City of Portland. Neither the summons nor the complaint was ever served upon the clerk of the city, as required by the applicable statute. Service was made upon the secretary of the dock commission. The latter was a department of the city. When the cause was tried in the circuit court, the defense was maintained, not by the city attorney, who, under the city's charter, was charged with control over all actions in which the city was interested, but by an attorney who was employed by the dock commission. Due to the fact that the summons was never served upon the city and that it had never appeared in the action, our decision overruled the motion to amend the judgment so as to make the city the judgment debtor.

We find nothing in *Enterprise Irrigation District v.*

*Enterprise Company* which is pertinent, except the following:

> "It is a fundamental rule that every person, when sued in court, shall have the right to defend against the claims of his adversary."

We believe that a distinction of a fundamental nature exists between the facts of the White, Walters and Western Land & Irrigation cases and this case. In those cases the defendant was never subjected to the jurisdiction of the court in the manner provided by law and had not waived that omission through a voluntary appearance. In the present case, the defendant, Nan Wood Honeyman, after she was made a defendant, filed an answer, and, as we shall shortly show, participated in other ways in the proceedings. The courses pursued in the Scott and in the present case, in our opinion, do not parallel each other.

The issue before us is whether or not error is reflected in the record which shows that after all of the plaintiffs' witnesses had given their testimony, but before the defense had rested, Mrs. Honeyman was added as a party-defendant and thereafter participated in the proceedings through (a) filing a demurrer to the amended complaint; (b) submitting an answer; (c) making stipulations concerning the evidence; and (d) filing objections to the proposed decree. A similar issue, we believe, was not determined in any of the cases cited by the appellants; and we likewise believe that that question is not governed by § 1-1006, O. C. L. A., upon which the appellants rely.

■ Normally, procedure has no rigid policy of its own, and permits a party to amend his pleadings and introduce new parties at any time, provided that those interested concur. Hence, even though § 1-1006 might

have enabled the appellant, Nan Wood Honeyman, to object to the amendments of December 6 and to the introduction of herself as a party-defendant, yet § 1-1006 did not demand that she object. She was at liberty to acquiesce if she chose to do so. Likewise she was at liberty to waive all departures from orthodox procedure and participate in the trial. The question before us, therefore, is, did she waive the objections. We shall now indicate what was done in the circuit court at the times with which we are concerned.

The ruling which made Mrs. Honeyman a party-defendant was preceded by a notice directed to her to appear on

"the 29th day of November, 1943, at the hour of two o'clock, p. m., * * * and show cause if any there be, why the said Nan Wood Honeyman should not be brought in and added and joined as a party-defendant * * * and why an order should not thereupon be made by this court in said cause permitting the above-named plaintiffs, and each of them, to amend the complaint * * *."

Five days after the entry of that order Mrs. Honeyman, through the counsel that now represents both her and her husband, made her showing by asserting:

"Such orders should not be entered herein, first, because the complaint does not state facts sufficient to constitute a cause of action against Nan Wood Honeyman, and, secondly, because the court is without authority to enter such order inasmuch as a trial has been had and Nan Wood Honeyman has not had an opportunity to defend said matter. Further, the said motion of plaintiffs is not timely and now comes too late."

November 29 counsel who had been representing the defendant addressed the court as follows:

"I move that Mr. Elton Watkins be associated as attorney for the defendant."

544

After the trial judge had acquiesced, Mr. Watkins declared:

> "And I appear individually for Mrs. Nan Wood Honeyman, and all papers in the future by Mr. Mowry can be served on me instead of on her, personally."

Thereafter Mr. Watkins conducted the defense. After the aforementioned objections of Mrs. Honeyman had been presented they were overruled and an order was entered which made her a defendant, and which was served upon Mr. Watkins, counsel for the Honeymans, who made a written acceptance of service. December 9 Mr. Watkins, as counsel for Mr. and Mrs. Honeyman, endorsed on the cover of the original complaint his acceptance of service. December 14, 1943, both appellants joined in a motion to strike the amended complaint from the files "for the reason that the court is without jurisdiction of the subject matter and * * * of the parties, and also because the amendments were made after all the testimony was heard and defendant, Nan Wood Honeyman, has had no hearing in the matter." The two appellants also joined in a demurrer which, besides being based upon the contentions that the complaint failed to state a cause of suit and that several causes were improperly united, repeated the objections which were set forth in the motion. Both the motion and the demurrer were overruled. December 28, 1943, the appellants joined in an answer to the amended complaint. The latter, after admitting the verity of some paragraphs of the complaint and denying others, prayed for affirmative relief. As the basis for the latter, the answer alleged that David T. Honeyman had performed his duty as trustee but was paid nothing for his services, "although the same are reasonably worth the sum of one per cent of all funds of

said trust passing through his hands." The prayer, in which both appellants united, asked that there be awarded to Mr. Honeyman "a reasonable sum for his services as trustee."

We now temporarily leave the judgment roll and turn to the evidence. The latter indicates that on January 10, 1944, the parties were again before the court. By that time the amendments of December 6 to the complaint had been made and the latter now assumed its final form. More than a month before January 10 Mr. Watkins had been made counsel for the appellants and had taken charge of the defense. Many days before January 10 the joint answer of the Honeymans was filed.

The purpose of the appearance of January 10, 1944, was to determine the course which should be pursued now that (1) the pleadings were revamped; (2) an adjudication was sought of Mrs. Honeyman's interest in the trust fund; and (3) compensation was demanded for Mr. Honeyman's services. February 23, 1943, eleven months before the occasion with which we are now concerned, the presentation of evidence had got its start. Prior to the filing of the complaint the deposition of Colonel Wood had been taken in California at an expense of several hundred dollars. Since the commencement of the action a costly audit had been made of Mr. Honeyman's records, and an expensive trial had stretched out for several weeks. Obviously, it would be desirable to avoid a repetition of all of this. A repetition could be avoided through a stipulation making the evidence which had been admitted under the old pleadings applicable to the new ones. We think that it is necessary to keep all of this in mind in interpreting what occurred January 10. When the trial judge found

that the parties were before him on that day, he inquired:

"What have we here this morning, gentlemen?"

Mr. Mowry, counsel for the plaintiffs, replied:

"Your Honor has set this Honeyman case for today again. Are you ready, Mr. Watkins?"

Mr. Watkins replied:

"Yes, sir."

At that point Mr. Mowry made an extensive review of the pleadings, in the course of which he showed that, although Mrs. Honeyman and James McI. Wood had been added as defendants, the issues remained the same, apart from the prayer that compensation be awarded to Mr. Honeyman for his services as trustee. Mr. Mowry then made an analysis of the facts followed by an argument that no compensation whatever was due to Mr. Honeyman for his services as trustee. He insisted that Mr. Honeyman had so mismanaged the trusts that compensation should be denied to him. The court next heard Mr. Watkins, who began by saying:

"Well, your Honor, I don't see that there is much need for an opening statement of mine. I understood that they would be here to present their case under the pleadings, and prepared to meet it, and the only thing I have to meet is that there is no testimony in this case now, as the pleadings are made up, except this exhibit—"

What next happened showed that Mr. Mowry had a different understanding of the situation, for he interrupted with the remark,

"Oh, all the former testimony."

Mr. Watkins continued:

"and the other exhibits in the case which consist of Colonel Wood's testimony and the report of Mr.

Pattullo and the testimony of Mr. Honeyman that he testify his fees were $36,000.''

Shortly Mr. Watkins enumerated other items of evidence ''that they are willing to say is in the case.'' He continued:

"They would stipulate, I presume, that Mr. Honeyman, if he were called, would testify again that his fees would be $36,000.''

Mr. Mowry replied:

''Well, we have all the testimony before your Honor previously received, of course, everything that was received last summer is before the Court.''

He showed that the evidence already before the court included a report filed by Mr. Honeyman in which he stated that his services as trustee were worth $36,000. After some further discussion concerning the issues, Mr. Mowry asked Mr. Watkins:

''Now, I suppose it is also conceded here that the exhibits which were introduced in evidence at the previous hearing may be regarded as re-introduced and re-received here. There is no objection to that, is there?''

Mr. Watkins replied:

''I don't know what exhibits were introduced.''

Mr. Mowry explained:

''All the exhibits.''

He added that he included in that category the deposition of Colonel Wood, the auditors' reports and ''all the other exhibits.'' Mr. Watkins offered no objection whatever to that course, and a ruling was then made whereby all of the mass of evidence which Mr. Mowry had mentioned was deemed re-received in evidence. In making his ruling, the trial judge explained:

"What we want is the new matter of the interest of these new parties. That is what we want to get into."

■ From the incident just mentioned it is clear that after the issues had assumed their final form and the parties were before the circuit court on January 10 for their last appearance there, a ruling was made, which met with no objection whatever, whereby the deposition of Colonel Wood, the report of the auditor and of the exhibits were deemed re-introduced under the new pleadings. Further, upon that occasion a stipulation was made concerning the facts bearing upon the issue as to whether Mr. Honeyman was entitled to compensation for the services which he had performed as trustee. Since the foregoing is true, it cannot be said that no evidence whatever was received after (1) the amendments of December 6 were made, (2) Mrs. Honeyman had been made a defendant, and (3) the joint answer of Mr. and Mrs. Honeyman had been filed. The course which took place and which we have just delineated constituted the submission by Mrs. Honeyman of herself to the jurisdiction of the court. The fact that Mrs. Honeyman filed both a demurrer and an answer and entered into stipulations concerning the evidence constituted upon her part a waiver of the fact that she had not been served with a summons. The principle of law which warrants the conclusions just expressed is so well known that we need neither state it nor cite authorities.

■ The only question, therefore, which remains is whether the appellants were denied an adequate opportunity to be heard upon the amended pleadings. If they had in mind the offer of any evidence other than facts bearing upon the amount of compensation which should be awarded to Mr. Honeyman, they never men-

tioned it. The colloquy that took place on January 10 between the trial judge and counsel was concerned at the outset with the question as to whether or not the new pleadings injected into the case any new issue. When it developed that the only new issue concerned compensation for Mr. Honeyman's services, the discussion centered upon the extent to which the evidence already received should be re-received and whether Mr. Honeyman was entitled to compensation for his services. The parties readily stipulated that all of the evidence previously received should be deemed re-admitted.

As we have already indicated, the foregoing colloquy was preceded by an argument made by Mr. Mowry. Mr. Watkins also presented arguments. He urged that the evidence which was received prior to December 5 failed to disclose that Mr. Honeyman had misappropriated the large sums described in the plaintiffs' pleadings. He contended that the evidence rendered it impossible for the court to award to the plaintiffs a judgment for more than $36,000. Thus, he was making arguments upon the re-admitted evidence. As he proceeded, Mr. Watkins three or four times employed the term "opening statement." However, we observe that in these so-called "opening statements" he did not delineate evidence which he expected to introduce, but reviewed the evidence which had been received prior to December 6. What he was discussing was the evidence readmitted under the new pleadings. Opening statements are based upon prospective evidence, and not upon reports, exhibits and evidence which has already been received. Toward the close Mr. Watkins said:

"And then we have submitted that, if they have rested, then we have stipulated that Mr.

Honeyman has been called to testify, and that he did testify, and that if called again he would testify that reasonable compensation would be what he stated before.''

The trial judge replied:

"Yes, that is right. The record may show that.''

Mr. Watkins added:

"That may be stipulated as to new testimony here.''

The trial judge acquiesced by saying:

"Well, that is all there is in the case then.''

In other words, the trial judge, through the remark just quoted, voiced his understanding that the parties wished to offer no further evidence. If Mr. Watkins had a different understanding, he did not voice it. Mr. Mowry, however, declared:

"We stipulate that all the testimony is re-received. * * * Everything that is in the record is re-received. Is that right, your Honor?''

The trial judge replied:

"Yes. I don't want to go over that record again.''

Mr. Watkins offered no objections whatever, but, to the contrary, when a moment or two later the trial judge said:

"Well, if that ends the case there is nothing further, why, I will render my opinion in due course.''

Mr. Watkins added:

"All right, your Honor.''

Showing clearly that Mr. Watkins had no further testimony to offer are the following sentences which

he employed in the course of the above-described colloquy:

"I am ready to brief it now and take the books and point out the pages that you can get it from yourself, if you want it. * * * I am prepared to argue now, or I can give it to your Honor in written brief. * * * Now, this is not testimony sufficient for the chancellor to enter any such decree * * *. Now, the only judgment they could get, looking at it from the books, without giving him a cent, would be a judgment in the Wood Trust of $36,946.00 * * *. And they come into equity here, and we are entitled to equity, and we ask for equity, and under this situation, your Honor, there isn't any decree in any chancellor's court in America that upon these records could be affirmed for anything like the amount these people are asking for."

February 18, 1944, the trial judge rendered a memorandum opinion which brought forth from the Honeymans no objection on the ground that they had been afforded an inadequate opportunity to present their evidence. February 26, 1944, counsel for the plaintiffs prepared a proposed decree which he served upon the appellants, and on March 7, 1944, they filed exceptions, which said:

"(1) That proposed decree unnecessarily gives a lot of history; (2) that said proposed decree has no basis in that no findings of fact have been proposed and none found; (3) that said decree as proposed is unnecessarily long; (4) that said proposed decree is unduly long and will require these defendants to go to some expense in presenting the question to the Supreme Court; (5) that said proposed decree does not name any successor and is therefore incomplete; (6) that said proposed decree does not adjudge and decree in accordance with the testimony in this case."

The exceptions made no claim that the amendments of December 6 to the complaint were irregular; that Mrs. Honeyman was improperly made a defendant; that the appellants were denied the privilege of presenting all of their evidence; or that the trial was incomplete or unfinished. We are satisfied that if the appellants had in any manner intimated in the trial court that they had further evidence which they wished to present, the trial judge would have afforded them a full opportunity to offer it. For the purposes of the trial the parties appeared in the trial court February 23, 1943, and made their last appearance nine months later, November 29, 1943. In the meantime, there occurred several recesses so that accounts could be audited, evidence assembled and witnesses reached. Generally, it was the trial judge who was urging the parties to present their evidence. In his desire to accommodate them and their witnesses, he forewent his summer vacation. The patience which he manifested so as to afford the parties a full opportunity to present every fact bearing upon the issues is not only a tribute to his fairness, but is also cogent proof that all evidence was offered which any one cared to present. Although appellants' counsel did not utter in the circuit court the words, "The defendants rest" before the trial judge said, "If that ends the case, there is nothing further," yet the words, "The defendants rest" were implied upon the defendants' part by the course which was pursued. If the trial judge had not inferred from the circumstances that the defendants had rested, he would not have said, "I will render my opinion in due course." And if the defendants had not wished the circuit court to understand that they had rested, they would not have acquiesced in the words, "I will render my opinion in due course" by saying, "All right, your

Honor.'' March 11 the exceptions to the proposed decree were overruled and the decree was signed. As we have previously indicated, it protected the interests of Mrs. Honeyman in the trust funds by safeguards which she had not sought by her answer or by any other medium. Without further analysis, we express our conclusion that the course pursued by Mrs. Honeyman gave the court full jurisdiction over her. We are also satisfied that the appellants were not denied full opportunity to present their evidence. In short, the procedure that was followed was regular and free from error. The third and fourth assignments of error, in our opinion, are without merit.

We shall consider the fifth and sixth assignments of error together. The fifth follows:

"Neither of the complaints as originally framed, nor the original complaints as amended, state facts sufficient to constitute a cause of suit, and it was error to overrule the demurrers lodged against the two complaints."

By the term "the two complaints" the assignment of error refers to the complaint in this suit and also to the one based upon the Seaman Trust. A separate opinion is being written in the Seaman Trust suit and, hence, matters pertaining to the pleadings in that suit are not mentioned in this opinion.

The sixth assignment reads:

"The intentions of the creator of the trust must prevail. To disregard those intentions is error. Entire document creating trust must be construed to determine Trustor's intent."

The merit of the propositions stated in the words just quoted is self-evident. Those propositions, however,

do not constitute an assignment of error. We assume that what the appellants had in mind was a contention that the decree of the circuit court fails to give effect to the intention of Colonel Wood. The appellants follow the above-quoted words with the following citations: § 18-402, O. C. L. A.; *In re Edwards Estate,* 153 Or. 696, 58 P. (2d) 243; *Williams v. Morris,* 144 Or. 620, 25 P. (2d) 135; *Boehmer v. Silvestone,* 95 Or. 154, 174 P. 1176, 186 P. 26; 65 C. J., p. 784; *Becker v. Williams,* 49 Ill. 208; *Burch v. Gaston,* 182 Ala. 467, 62 So. 508.

The appellants argue:

"The circumstances surrounding the creation of the trusts, the powers conferred on the trustee and the purposes of the trusts are easily determined by a reading of the documents. These must be given effect. They control, and no construction by the court is required. * * * It likewise must be borne in mind that the very thing that is prayed for in these suits, namely, an accounting, is the very condition that the creator said must not be exacted. It was a family affair. It was his property. It was his construction, his intent, his orders, his wishes meticulously set forth. He did not want to be bothered with those burdens. He laid them upon the shoulders of others, without compensation to them and with all discretionary powers which he himself could have exercised if he had not made the trusts but had kept the funds and handled them himself. Now, if Col. Wood had not done this, and, in doing it, had done exactly as plaintiffs claims trustee did, would anybody have cause for complaint against him? Of course not. It's true that he could have wasted, gambled away, or destroyed the funds without being called to account by anyone, which a trustee could not do; but that is not what is complained of against the trustee. The complaints, if they state any basic facts for any relief, pray for an accounting, a thing the creator said and intended was not to be required of the trustee."

 We agree that the trust instruments express their meaning clearly and that resort need not be had to the rules of construction which determine the meanings of ambiguous writings. We do not, however, agree that (1) the trust instrument which delineated the defendant's duties in the Wood Trust relieved him of the duty of accounting; (2) because Colonel Wood was at liberty to waste money belonging to himself, the defendant was free to convert to his own use funds which Colonel Wood had entrusted to him; and (3) the defendant was required to serve without compensation. Although it is true that the trust instrument which governed the Educational Trust says "the trustee is hereby relieved from all obligation to account," the legality of that provision remains for determination. The difference between the wasting of funds by an individual who owns them and the conversion to his own use by a trustee of the trust estate is so self-evident that no comment is necessary. Finally, neither of the trust instruments imposed upon the defendant a duty to serve without compensation. Generally, a trustee who is faithful to his trust is entitled to compensation out of the trust estate: *Marshall v. Frazier,* 159 Or. 491, 80 P. (2d) 42, 81 P. (2d) 132; Restatement of the Law, Trusts, §§ 242 and 243. It will be recalled that the answer prays for judgment in a very large sum as compensation for the defendant's services.

We believe that the principal contention which the appellants wish to submit under these two assignments of error is that the defendant was under no duty to account.

 It must be apparent that when one becomes a trustee and thus undertakes to administer an estate for the benefit of another, he must maintain records of his transactions so complete and accurate that he can

show by them his faithfulness to his trust. It is not enough for him to know that he is honestly performing his duty. Since, generally, the burden of proof rests upon him to prove his fidelity, he must be able to sustain his position by honest records. Bogert on Trusts and Trustees, § 962, says:

"It is the duty of the trustee to keep full, accurate, and orderly records of the status of the trust administration and of all acts thereunder. * * * 'The general rule of law applicable to a trustee burdens him with the duty of showing that the account which he renders and the expenditures which he claims to have made were correct, just and necessary. * * * He is bound to keep clear and accurate accounts, and if he does not the presumptions are all against him, obscurities and doubts being resolved adversely to him.' * * * A plan should be employed which will show items of principal and their investment at the beginning of the trust, and all later additions or subtractions therefrom and changes of investment, as well as a separate set of entries to record income received and paid out. * * * For each cestui it is advantageous to have a separate record of sums due and amounts paid him by the trustee."

The "plan" suggested by those words is so logical and simple that any trustee who means to perform his duty would embrace the plan, whether required by law to do so or not. The defendant's books, however, failed to comply with those simple requirements. The section from which we have been quoting continues:

"The principal penalty usually stated to apply to a trustee who fails to keep proper records of his trust is that 'all presumptions are against him' on his accounting, or that 'all doubts on the accounting are resolved against him.' He has the burden of showing on the accounting how much principal and income he has received and from whom, how much

disbursed and to whom, and what is on hand at the time.''

Scott on Trusts, § 172, states the rule in like terms.

 It must be obvious that since a trustee administers the estate, not for his own benefit, but for that of the beneficiary, he must render his records available for the inspection of the beneficiary and supply the latter with information pertinent to the trust. The requests must, of course, be made at reasonable times. The reasonableness of the rule just stated becomes more apparent when we bear in mind the fact that the records, documents and account books which a trustee procures so that he can perform his duty do not belong to him personally, but are parts of the trust estate. The rule which authorizes the beneficiary to inspect the trust records is essential in order that the beneficiary may be assured that he is obtaining the income or other advantages which the settlor intended. We quote again from Bogert on Trusts and Trustees, § 961:

> "That the settlor has created a trust and thus required that the cestui enjoy his property interest indirectly does not imply that the cestui is to be kept in ignorance of the nature of the property and the details of its management. If the cestui is to be able to hold the trustee to proper standards of care and honesty and procure for himself the benefits to which the trust instrument and the doctrines of equity entitle him, he must know of what the trust property consists and know how it is being managed.
> "From these considerations it follows that the cestui is entitled to demand of the trustee all information about the trust and its execution for which he has any reasonable use. If the beneficiary asks for material information about the terms of the trust, its present status, past acts of manage-

558

ment, the intent of the trustee as to future operation, or other incidents of the operation of the trust, and these requests are made at a reasonable time and place, and not merely vexatiously, it is the duty of the trustee to give the cestui the facts for which he has asked. Furthermore, the trustee must permit the cestui to examine the account books of the trust, * * * ."

Scott on Trusts, § 173, says:

"The trustee is under a duty to the beneficiaries to give them upon their request at reasonable times complete and accurate information as to the administration of the trust. The beneficiaries are entitled to know what the trust property is and how the trustee has dealt with it. They are entitled to examine the trust property and the accounts and vouchers and other documents relating to the trust and its administration. Where a trust is created for several beneficiaries, each of them is entitled to information as to the trust."

From Restatement of the Law, Trusts, § 173, we take the following:

"The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents . relating to the trust."

Elliott v. Mosgrove, 162 Or. 507, 91 P. (2d) 852, 93 P. (2d) 1070, and Grandy v. Williams, 147 Or. 409, 34 P. (2d) 622, are two recent instances in which this court recognized some of the principles stated by the above authorities.

■ It is clear that in the Wood Trust, at least, the defendant owed a duty to maintain accurate records,

to supply upon reasonable request pertinent information, and to submit to an accounting.

The trust instrument which governed the Educational Trust, however, contains the clause which says:

"The said trustee is hereby relieved from all obligation to account to the beneficiaries of this trust, or to any one, for any of the trust funds or income therefrom; the provisions above that receipts by the mother or custodian of said children shall fully acquit said trustee, and that having made payments to said mother or custodian, he shall not be further bound to see to the application of said trust funds or income, being merely for the guidance and protection of the trustee, and not obligatory on him, and he is hereby relieved from any duty of accounting whatsoever."

The instrument bears the signatures of all of the beneficiaries of the Wood, Seaman and Educational Trusts, with the exception of Nanny Moale Wood and William Maxwell Wood, Sr. The latter was deceased when the Educational Trust was created, and Mrs. Wood was not a beneficiary of either the Seaman or Educational Trusts. The signatures of the three sons of William Maxwell, Sr., were not written by them but by their mother. They were minors when the trust was created.

Colonel Wood and those who signed the writing did not make a gift to the defendant of the $15,000 fund by signing that paper. The document refers to the defendant many times as trustee and repeatedly uses the word "trust". Although the legal title to the fund was in the defendant, the beneficial interest was not in him but in the three beneficiaries. Clearly, he was not made a gift of the money, and it was his duty to administer the trust in harmony with the trust instrument. The latter conferred upon the de-

fendant wide discretion concerning the investment of the fund; the use of principal as well as of income; the amount to be distributed to each beneficiary; the periods, whether quarterly or semi-annually, when distributions should be made; and the time when the final distribution should take place. Yet, notwithstanding those facts, the fund was not his, but was entrusted to him in a capacity—a trust relationship —which is a favorite of our law. The law attaches such great social value to trusts of the kind now before us that virtually every duty owed by a trustee is enforcible by a decree of the chancellor. In the present instance, whether expressly set forth in the trust instrument or not, the defendant was required to distribute nothing to any one except to the three beneficaries, to refrain from self-dealing, and to give to the beneficiaries, before the expiration of the trust, the entire amount of the principal and income, less lawful expenses. The settlors of the trust expected him to perform those duties, and the only way by which obedience could be enforced was by suit in equity. For a violation of any of those duties, a court of equity could remove the defendant from his office, deny him compensation for his services or enter judgment against him for any sum misspent. But remedies of that kind normally are not feasible unless an accounting has first been had.

We have gone into the above matters so extensively because we think that they should be kept in mind as we determine the validity of the above-quoted paragraph of the Educational Trust instrument. As is said in 65 C. J., Trusts, § 778,

"Accounting, as an obligation and function of a trustee. has been said to have two meanings: (1) That of merely informing the cestui que trust of all

things which he is entitled to know, (2) actually responding to such liability as may be incurred by the fiduciary in the management of the trust. The rendition and the settlement of accounts are distinct matters."

If a fiduciary can be rendered free from the duty of informing the beneficiary concerning matters of which he is entitled to know, and if he can also be made immune from liability resulting from his breach of the trust, equity has been rendered impotent. The present instance would be a humiliating example of the helplessness into which courts could be cast if a provision, placed in a trust instrument through a settlor's mistaken confidence in a trustee, could relieve the latter of a duty to account. Such a provision would be virtually a license to the trustee to convert the fund to his own use and thereby terminate the trust. When we mentioned mistaken confidence, we had in mind the words of the Wood Trust instrument: "I think Dave Honeyman would be an ideal trustee." It was that mistaken impression which caused Colonel Wood to write the provision which the defendant now seeks to employ as an impenetrable shield.

Bogert on Trusts and Trustees, § 972, says:

"A settlor who attempts to create a trust without court accountability in the trustee is contradicting himself. A trust necessarily means rights in the cestui, enforcible in equity. If the trustee can not be called to account, the cestui can not force the trustee to any particular line of conduct with regard to the trust property or sue for breach of trust. The trustee may do as he likes with the property, and the cestui is without remedy. If the court finds that the settlor really intended a trust, it would seem that accountability in chancery or other court must inevitably follow as an incident. Without an account the cestui must be in the dark

as to whether there has been a breach of trust and so is prevented as a practical matter from holding the trustee liable for a breach.''

The following is taken from Scott on Trusts, § 172:

''In In re Dean where a testator bequeathed an annual sum to trustees to be applied to the maintenance of certain animals and he declared that the trustees should not be bound to render any account of the application or expenditure of the money, it was held that the testator did not intend to make a beneficial gift to the trustees but merely to confer a wide discretion upon them as to the application of the money. The court held that the trustees were under a duty to account. In other cases also it has been held that in spite of such provisions as these, the trustee is under a duty to account. Thus it had been held that a provision in a will that the executors and trustees named therein should not be obliged to file with the surrogate any inventory is against public policy, since to give effect to the provision would remove the barriers designed to protect estates from misappropriations. Similarly it has been held that where a husband transferred property to his wife in trust for the support of their children, and provided that she should not be required to account for the expenditure of the property, the children can maintain a suit against their mother to compel an accounting.''

We quote once more from Bogert on Trusts and Trustees, § 972:

''If the settlor tries to reduce the accounting duty of the trustee, either by providing that the common-law duty shall be diminished or by stipulating that it shall not be necessary for his trustee to obey a duty to account expressed in statutory form, it would seem that the effort should be invalid and the duty of the trustee unaffected. The settlor ought not to be able to oust the court of its constitutional or statutory jurisdiction, or to over-

ride the acts of the legislature concerning information to be furnished by trustees to their beneficiaries. Provisions of this sort in deeds or wills would seem against public policy and void, just as contract clauses to like effect are declared null.''

See also 65 C. J., Trusts, § 7718, p. 878.

The sections of Scott on Trusts and Bogert on Trusts and Trustees, from which we quoted, cite several authorities in support of the rule which they state. Note should be taken, not only of the decisions cited in the principal text, but also of those in the pocket supplements. The section of Corpus Juris mentioned by us also collates some decisions. We examined the authorities cited by those three textbooks and believe that they support the statements which we quoted. Some of the decisions are reviewed in § 972 of Bogert. We shall take note of two of the decisions. In Application of Central Hanover Bank & Trust Company (Momand), 176 Misc. 183, 26 N. Y. S. (2d) 924, the deed of trust provided that the income produced by the estate should be paid to the grantor during her life and that upon her death the estate should be distributed among her issue. A provision of the trust deed said:

"The trustee shall send at least semi-annually to the grantor or immediate beneficiary a full statement of the investments then held by the trustee and of the receipts and expenditures, both in the income and principal accounts, since the last semi-annual statement; and the accounts and records of the trust shall be open to the examination of the grantor."

A further provision said:

"* * * and it shall not be necessary to consult or procure the concurrence of any remaindermen or other party having a vested or contingent

remainder or other interest in the trust fund &ast; &ast; &ast; nor shall any such party have any right of accounting, claim, interest, damage or other cause against the trustee or in respect of the trust and trust fund concerning any matter or thing which may arise (either from omission or commission) during the lifetime of said grantor; it being the design and direction of the grantor that the fullest power and discretion be possessed by the trustee for the especial advantage and benefit of the grantor during her lifetime irrespective of the ultimate interests without interference from any other party or ultimate beneficiary.''

In sustaining the validity of that provision, the decision said:

"I therefore do not see that it offends public policy for the grantor of such an inter vivos trust to provide that the trustee shall be excused from accounting to any one but the grantor for acts of the trustee performed during his lifetime, and in the absence of constitutional or statutory restraint I am not disposed to hold that such a limitation is illegal. There is, of course, a manifest distinction between a case in which no one can subject a trustee to an accounting and one in which the right to an accounting and the right to object to the acts of the trustee is limited to the creator of trust, whose property constitutes the corpus of the trust and who reserved the income therefrom during his lifetime &ast; &ast; &ast;; under such a construction as is here sought by the accounting petitioner, there is always some one who can hold the trustee to account.''

That decision was affirmed in memorandum opinions bv the Appellate Division in 263 App. Div. 801, 32 N. Y. S. (2d) 128, and by the Court of Appeals in 288 N. Y. 608, 42 N. E. (2d) 610.

Burch v. Gaston, 182 Ala. 467, 62 So. 508, was an application for mandamus against the local probate

judge to require him to desist from compelling the petitioners to file their accounts and vouchers for a settlement of the executorship of the estate of Florence N. Burch, deceased. The will of the deceased gave to the appellants one-half of an estate in trust for the support of the deceased's grandchildren and directed that in making expenditures "the said trustees shall use their best judgment and shall not be liable or amendable to any court or person in the exercise of such judgment." It provided that when any grandchild married or reached the age of twenty-one, "the portion of my estate to which they are entitled and remaining undisposed of, shall be paid over to such one; but in arriving at the amount to be turned over to said child, the statement of such accounts relating thereto as made by the trustees herein appointed shall be treated as correct and final, and the amount so stated is the amount I direct shall be paid over to such child." The court held that the above provisions were valid in general, but that they would not shield the trustee "if there be circumstances of fraud or of the like." Nor would they prevent, so the court held, "one or more of the grandchildren who may have become entitled under the terms of the will to receive the unexpended proportion of the property devised or bequeathed to them" from obtaining an accounting. The decision also pointed out that "as against creditors, certainly it was not within the power of the testatrix to defeat the provisions and policy of the law of the state requiring periodical accounts." The decision sustained the order of the lower court which issued the writ.

From Restatement of the Law, Trusts, § 172, Comment (d), we now quote:

"By the terms of the trust the necessity of

keeping formal accounts may be dispensed with. If a trust is created, however, the trustee is subject to liability if it appears that he has improperly dealt with the trust property. A provision in the terms of the trust that there shall be no liability to account, however, may manifest an intention not to create a trust."

We come now to an expression of our own views. We are completely satisfied that no trust instrument can relieve a trustee from his duty to account in a court of equity. We are, however, prepared to adopt the point of view of the Restatement that a trust instrument may lawfully relieve a trustee from the necessity of keeping formal accounts. When such a provision is found in a trust instrument, a beneficiary can not expect to receive reports concerning the trust estate. But even when such a provision is made a part of the trust instrument, the trustee will, nevertheless, be required in a suit for an accounting to show that he faithfully performed his duty and will be liable to whatever remedies may be appropriate if he was unfaithful to his trust. Such being our views, it follows that, so far as the Educational Trust is concerned, the defendant was not required to maintain formal records and supply information to the beneficiaries concerning the condition of the corpus of the trust. The provision under consideration did not, however, relieve him from the accounting which the circuit court exacted of him. According to the facts alleged in the complaint, both trusts had terminated long before the complaint was filed. We conclude that the attacked pleading states a cause of suit upon both the Wood and the Educational Trusts. We hold that the fifth and sixth assignments of error are without merit.

██ The seventh assignment of error follows:

"Claims for accounting of trusts created in 1918 filed in 1942 are stale, and plaintiffs are guilty of laches and are estopped from seeking an accounting.

And such defense need not be raised by the answer."
In support of the assignment, the appellants cite: *Neppach v. Jones,* 20 Or. 491, 26 P. 569, 23 Am. St. Rep. 145; *Nelson v. Portland Trust & Savings Bank,* 153 Or. 19, 53 P. (2d) 1051, 55 P. (2d) 1105; *Scotte v. Hood,* 170 Or. 370, 133 P. (2d) 997; *Hume v. Beale,* 84 U. S. 336, 21 L. Ed. 602; *Sullivan v. Portland & Kennebec R. R. Co.,* 94 U. S. 806, 24 L. Ed. 324; *Montgomery v. Anglo-California Trust Co.,* 157 Or. 187, 68 P. (2d) 1057; *Carpenter v. Carpenter,* 153 Or. 584, 56 P. (2d) 305, 57 P. (2d) 1098, 58 P. (2d) 507, 105 A. L. R. 386. We have examined all of those authorities and find it unnecessary to review them herein. The principle of law which we deem applicable to the situation is thus stated in § 219.2 of Scott on Trusts:

"A beneficiary is not barred by laches from holding a trustee liable for breach of trust if he did not know or have reason to know of the breach of trust. Since the trustee holds and manages the trust property, it is frequently possible for him to commit a breach of trust of which the beneficiary has no means of knowing. This is likely to be the case where the trustee sells trust property to himself individually, or sells his individual property to the trust. In such cases the beneficiary is not barred by laches from setting aside the transaction, even though he knew of the purchase, if he did not know or have reason to know that the trustee was dealing with himself individually."

In the argument which the appellants submit in support of this assignment of error, they make no claim that the plaintiffs, after becoming apprised of the state

of affairs, failed promptly to file this suit. Upon the other hand, they dwell upon the long-continued depression which got under way in 1929 and which carried the price of securities to very low levels. However, the accounting charged nothing against the defendant on account of the decline in security values. He was given full credit for every dollar which he paid for securities purchased, and was even credited with $25,000 for the Honeyman notes. We explain that when we said in previous paragraphs that the remaining assets of the Wood Trust are worth $5,698.95 and those of the Seaman Trust $480, we did not use par value but market value. We are clearly satisfied that this assignment of error possesses no merit.

The eighth assignment of error follows:

"It was error for the court to remove the trustee summarily and give judgment against him and subject his property to sale upon execution and order execution thereon without at least giving him reasonable opportunity to comply with the orders of the court, and try to save his property from sale on execution. Nor was it equity to deny the trustee any compensation for his time and trouble."

In support of that contention, the appellants cite: *Hull v. Heinrich,* 138 Or. 117, 3 P. (2d) 758, 6 P. (2d) 41; *McAfee v. Thomas,* 121 Or. 351 (Point 5, page 359), 255 P. 333. Since the defendant described himself as "very, very insolvent", he, of course, could not restore to the trust estates the large sums which the circuit court found he improperly converted to his own use. We believe that the distinction between the situation dealt with in the Hull case and this one is sufficiently clear so that no comment is required. Point 5 of the McAfee opinion follows:

"As to the compensation of trustee, as a general

principle trustees are entitled to a reasonable compensation for their time, trouble and skill in managing the fund usually payable out of the income, but in many cases it is payable out of the principal, the matter being more or less in the discretion of the court."

■ As we have previously pointed out, the defendant sold $68,000 of securities without placing a dollar of their proceeds in any trust account and without reinvesting any of that money, with the possible exception of $1,000. In short, he converted to his own use that very large sum of money. We are satisfied that he helped himself to other assets of the trusts. We regret that situation, and it is no pleasure to record defalcations which leave a lasting blemish upon a name which Oregon had honored from pioneer days. Yet when we are asked to award the defendant compensation for his services, we have no escape from performing the unpleasant duty of mentioning the defendant's repeated breaches of his trust. We are satisfied that no error was committed when he was denied compensation, when he was removed from his office of trustee, and when judgment was entered against him for the sums which he had converted to his own use.

The final assignment of error follows:

"It was error to enter the decrees as rendered in these two suits in the forms as entered and for the relief granted. The intent of Trustor is supreme and the sole guide."

The appellants follow that statement with a citation to the trust instruments, to the letter dated January 19, 1931, which Colonel Wood wrote to the defendant and his son Erskine, and to 26 R. C. L. 1252; *Anderson v. Bean,* 272 Mass. 432, 172 N. E. 647, 72 A. L. R. 959;

*Matter of Schliemann,* 259 N. Y. 497, 182 N. E. 153, 84 A. L. R. 662; § 18-402, O. C. L. A., and cases annotated; and *Eagan v. Internal Revenue,* 43 Fed. (2d) 881 (5th Cir.), 71 A. L. R. 863.

We believe that the circuit court gave full effect to Colonel Wood's intentions and purposes. We are certain that the trial judge took into consideration the various letters and trust instruments which came from Colonel Wood's hand and which threw light upon his purposes. The defendant was justified in believing that since the trusts were family affairs a considerable latitude was to be allowed to his discretion, and that he would not be expected to maintain records as complete as if he were acting for strangers. All of that, we are sure, was taken into consideration when the validity of the defendant's action was determined. In fact, the family aspect of the situation caused the trial judge, so we surmise, to take a generous attitude toward the defendant's act in loaning $25,000 of trust funds to a concern of which he was a principal officer. But after the trust instruments are so construed that they vested the defendant with the broadest possible discretion, it still remains true that not one word of those instruments authorized him to help himself to any of the trust funds. No word in any of the trust instruments or in any of Colonel Wood's writings empower the defendant to convert to his own use a single dollar of the trust assets. The appellants can not succeed in showing error in the decree or in reducing the amount of the judgment unless they can point to some provision of the trust instruments which justified the defendant to treat parts of the corpus of the estate as his own. The attacked judgment, as we have many times said, is based solely upon sums which the defendant converted to his own use. It seems manifest that if the circuit court

had not deemed this a family affair that the judgment which was entered against the defendant, and which is now under attack, would have been for a sum very much larger. We have gone over the defendant's records with care and have compared the figures compiled by Mr. Pattulo with the criticism of them submitted in the appellants' brief, but find no error. In fact, we think that the attacked judgment could very properly have been entered for a larger sum. In our opinion, this assignment of error reveals no merit.

The above disposes of all assignments of error. After careful consideration of them we are left with a conviction that the trial was conducted without error. In fact, the defendant was shown every consideration which extreme patience and a high sense of duty could bring forth. We are certain that the trial judge was as reluctant as we are to subscribe to the attacked decree. However, the defendant's course rendered no other solution possible. What may have been the cause for his shameful breach of trust, we do not know. We hope it is apparent that we have not mentioned all of the facts shown by the extensive record.

The decree of the circuit court is affirmed. Costs and disbursements are awarded to the respondents.