Argued April 18, modified and remanded November 7, 1951

# DUNIWAY *v.* BARTON

### 237 P. 2d 930

*B. G. Skulason,* of Portland, argued the cause for appellant. With him on the brief was Ashley Greene, of Portland.

*William J. Prendergast, Jr.,* of Portland, argued the cause for respondent. With him on the brief were Leo Levenson and Howard I. Bobbitt, of Portland.

Before BRAND, Chief Justice, and HAY, ROSSMAN, LUSK, LATOURETTE and WARNER, Justices.

LUSK, J.

This is a suit for an accounting of the proceeds of assets belonging to the plaintiff, Katherine S. Duniway, and entrusted to the defendants, E. R. Errion and J. R. Barton, for investment by them on behalf of the plaintiff, and of profits alleged to have been secretly made by the defendants through the use of funds of the plaintiff wrongfully converted by them.

The court entered a judgment against the defendant Barton in the sum of $46,325 and against the defendant Errion in the sum of $63,000 less $6,000 paid by that defendant to the plaintiff since the commencement of the suit. Barton alone has appealed.

The complaint alleged substantially the following facts: Prior to December 8, 1938, plaintiff was the owner of real properties and securities worth $72,500, and plaintiff's mother owned certain securities worth $7,500, which were in the possession and control of the plaintiff, who thereafter succeeded to their ownership. In the month of August, 1938, plaintiff met the defendant Errion, who learned of her property holdings, represented to her that he was an experienced business man skilled in the handling and investment and reinvestment of all types of properties, and urged upon plaintiff that she permit him to handle and direct the sales and dispositions of her properties and reinvest the proceeds in securities and other investments, more conservative and dependable than the properties then held by plaintiff. Thereafter defendant Errion introduced plaintiff to defendant Barton, and they represented to her that if

she would turn over her properties to them they would handle them for her sole benefit, and that the proceeds of the sales thereof would be invested in good conservative investments solely for the benefit of plaintiff. Relying upon these representations, plaintiff turned over all of her properties, some to the defendant Barton and some to an association designated "Katherine S. Duniway Estate, Limited (an Estate in Joint Tenancy)," in which plaintiff, Barton and one L. R. McGee were designated as trustees. But all the sales and other transactions with reference to said properties and the purchase of other properties with the proceeds of sales were directed and handled by and under the direction of the defendants. The defendants sold the greater portion of plaintiff's properties, and thereafter represented to plaintiff that they had invested the proceeds in oyster lands, the total of such investments up to July, 1939, being $40,500. Defendants further represented that these were good, sound, conservative investments. In January, 1943, defendants advised plaintiff that it was to her interest that the "Katherine S. Duniway Estate, Limited (an Estate in Joint Tenancy)" be dissolved, and represented to her that they were delivering to her oyster lands in Tillamook County and Coos County of the value of $17,500 and notes and purchase agreements of the value of $25,545.12. Subsequent to January 1, 1947, plaintiff learned that such representations were false; that the moneys derived from the sales of her properties were used in purchasing extensive oyster lands and oyster beds for and in the name of defendants and corporations controlled by them; that oyster lands which they represented to plaintiff had cost from $1,500 to $1,800 per acre, and for which they charged plaintiff and said "Estate in Joint Tenancy" said sums, had actually cost defendants from $4 per

acre to $50 per acre, and the difference between what they charged plaintiff and what they paid for the lands was converted by the defendants to their own use; and that defendants had converted other funds in large amounts, the proceeds of the sales of the plaintiff's properties, and made secret profits by the use of moneys so converted. The notes and purchase agreements received by plaintiff in the transaction of January, 1943, were not good collectible obligations and were of little value; and the oyster lands in Tillamook County, for which defendants charged plaintiff $5,000, have never been conveyed to plaintiff, the defendants never owned them, and were never in a position to convey any title thereto.

The appealing defendant, by his answer, in addition to denying all allegations of fraud, alleged that at all times the plaintiff had full knowledge of all the transactions complained of and of the account between them; that a complete and correct itemized statement had been prepared and submitted to her from time to time and examined and accepted by her as correct; and that the suit was barred by the statute of limitations.

The separate judgments entered against each of the defendants were based solely upon illegal profits which the court found they had made through the misapplication of plaintiff's funds. The decree recites that defendants sold certain of the real property and securities of the plaintiff and "received as a result of said sales the total sum of $43,045.12 which said funds were thereupon held by defendants while acting as agents of plaintiff and in a fiduciary capacity but that with the exception of approximately $1500.00 thereof defendants did not use or apply any of said funds for the benefit of plaintiff nor account to plaintiff for the same but misappropriated and fraudulently misapplied said funds

to their own use and in the course thereof used said misappropriated funds in the purchase and sale of certain oyster lands and other properties and of oyster seed and in conducting oyster growing and canning operations and by said misuse of plaintiff's said funds defendant Barton has derived profits and gains in an amount not less than $46,325.00 and defendant Errion has derived profits and gains in an amount not less than $63,000.00.''

This language of the decree narrows the issue on this appeal. We are not concerned with the question whether defendant Barton must account for the moneys received by him from the plaintiff, but only whether he was properly called upon to account for secret profits alleged to have been derived from the wrongful use of such funds in his own business, and, if so, the amount of such profits. Plaintiff does not contend otherwise, and there are two reasons why she could not do so successfully. First, she has not cross-appealed. Second, before the case was finally submitted in the Circuit Court counsel for the plaintiff stated to the court:

"* * * the theory on which the plaintiff is proceeding is that she prefers and asks that she be given judgment against each of the defendants for the profits that the defendants respectively made out of the use of her money, and at the argument which we had on this matter last June I cited several authorities and the authorities are universal that if a fiduciary uses funds which belong to the beneficiary, and for his own purposes and makes profits out of it, that one of the options of the beneficiary is to get a judgment against the trustee or the fiduciary for the amount of those profits.''

Moreover, it appears by a stipulation entered into by counsel for the parties on the oral argument in this

court that Errion has settled with the plaintiff and has paid her $49,000, while her testimony on the trial discloses that she had received $5,200 in payments on contracts delivered to her in the settlement of January, 1943, $1,000 of this sum being interest. She has already recovered, therefore, her original investment together with a substantial amount of interest thereon.

Although the record, consisting of 520 pages of testimony and 79 exhibits, is in some respects, due to the tortuous method pursued by the defendants in dealing with plaintiff and her properties, difficult to understand and at times incomprehensible, there is no difficulty whatever in perceiving their fraudulent conduct. Miss Duniway was a high school teacher, who, partly through inheritance and partly by her savings, had acquired a competency consisting of stocks and bonds and real estate, including timber lands. Errion met her first in August, 1938, and, as the expression goes, "sold himself" to her as one having vast business experience and highly qualified to advise her about investments. He also gave his associate or "first lieutenant", Barton, a handsome recommendation. Afterwards, in December, 1938, Errion introduced her to Barton, who confirmed Errion's estimate of himself as a competent and successful business man. Among his other accomplishments he was fast becoming a leader in a great oyster industry. Between the two of them she was persuaded to turn over her properties to Barton so that they could be liquidated by him and the proceeds put into investments which, they represented to her, would be safer than those she then held.

Miss Duniway was told that "a smart way" to handle her problem was to have a trust, and out of this suggestion emerged the "Katherine S. Duniway Estate, Limited (an Estate in Joint Tenancy)" cre-

ated by an amorphous document resembling somewhat a "Massachusetts Trust" (see *Hecht v. Malley,* 265 U.S. 144, 68 L. Ed. 949, 44 S. Ct. 462), by which Miss Duniway conveyed certain of her real property to herself, Barton and L. R. McGee, an accountant, "as joint tenants in trust of an estate of value", and the trustees accepted the trust and agreed with a plethora of legal verbiage to manage its properties. The document does not name a *cestui que trust,* but does provide for 1,000 "expectancies" of a nominal value of $100 each, and all of the "expectancies" were assigned to Miss Duniway. The entrepreneurs then provided a minute book bound in heavy hand-tooled leather, the name of the organization embossed in gold on the outside; a meeting was held on December 16, 1938, at which Miss Duniway was elected chairman of her "Estate" (as it will hereinafter be termed), Barton vice chairman and manager, and McGee secretary-accountant; and the project was launched.

It is quite apparent that the "Estate" was a sham contrived as part of the scheme of Errion and Barton to fleece Miss Duniway. It was designed both to impress her with the businesslike methods of the defendants and to provide a record, fair on its face, of devious transactions. These transactions, ostensibly with the "Estate", were actually with the plaintiff. Errion and Barton induced her to transfer all her securities and convey all her real property except her home, to Barton. From the proceeds of the liquidation of her securities and the sale of a tract of timber they received $43,-045.12, which Barton deposited in his own bank account. In the early part of 1939 Errion and Barton conveyed to the "Estate" 25 acres of oyster lands in Coos Bay for which they paid $50 an acre. Ten acres were seeded lands and 15 acres unseeded. They falsely represented

to Miss Duniway in writing that the market price of seeded lands was $1,800 an acre and of unseeded lands $1,500 an acre. The total purchase price was $40,500 for lands which they had bought for $1,250, and it was paid with Miss Duniway's money which they had promised to invest for her in sound, conservative investments. They then took this money and engaged in the oyster business at Coos Bay on an extensive scale. They planted oyster beds, acquired a cannery, and bought hundreds of acres of oyster lands which they sold for more than $200,000, part of the purchase price being paid in cash, and notes and contracts being given for the balances. Their operations extended over a period of more than 4 years. The "Estate" was "dissolved" on January 30, 1943. From the time that Miss Duniway turned over her properties to Barton until the dissolution of the "Estate" the total return to her on her investment was $815, advanced by Errion and Barton against anticipated profits from her oyster beds. She was given no interest in the oyster business of Errion and Barton, although she twice mortgaged her home to raise money for them to purchase oyster seeds.

At the dissolution of the "Estate" the parties made what is claimed to be a settlement. The minutes of the meeting of January 30, 1943, signed by Miss Duniway, Barton and McGee, show that the "Estate" had received from Miss Duniway the sum of $43,045.12. Certain outstanding "obligations" of Errion and Barton, and of a corporation controlled by them known as Coos Bay Land Owners Association, were cancelled. Her remaining real properties were reconveyed to her, and there were assigned to her certain assets of the "agreed value", to a penny, of the amount of money which had been received by Errion and Barton from the liquida-

tion of her holdings. These assets are listed in the minutes of this meeting as follows:

| | |
|---|---|
| "Agreed value of Tillamook 100 acres | $ 5,000.00 |
| "Agreed value of Coos Bay 100 Beds and Crop | $12,500.00 |
| "Agreed value of Assigned Proceeds of Notes | $12,772.56 |
| "Agreed value of Assigned Proceeds of Purchase Agreements | $12,772.56 |
| | $43,045.12" |

Obviously Barton was guilty of a gross fraud upon the plaintiff. He was her "financial agent"—it was so he described himself—and therefore a fiduciary, owing her a high degree of good faith and loyalty. *Marnon v. Vaughan Motor Co.*, 184 Or. 103, 168, 194 P. 2d 992; 2 Am. Jur., Agency, 203, § 252. The standard of behavior for him was "not honesty alone, but the punctilio of an honor the most sensitive," Cardozo, Chief Justice, in *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 62 A.L.R. 1. It was his duty not only not to misrepresent to her the value of the lands he and Errion sold her, but to disclose to her fully all the material facts with reference to their value within his knowledge, including the fact that he and Errion had paid only $50 an acre for these lands. *Ridgeway v. McGuire*, 176 Or. 428, 433, 158 P. 2d 893; *Porter v. Buckley*, 127 Or. 22, 28, 270 P. 905; Restatement, Agency, § 390. Barton, of course, knew that, had he made these disclosures, even Miss Duniway, confiding and credulous though she was, would not have become their victim.

The only matters asserted by way of defense which call for discussion are that Miss Duniway participated in the meetings of the "Estate", and therefore knew the facts; that she made a settlement of all her claims

against Errion and Barton in January, 1943, and gave them full releases; and that the suit is stale, it having been commenced in March, 1947, some 9 years after the initial fraud.

While Miss Duniway was "chairman" of the "Estate" and signed the minutes of meetings, as well as anything else that Errion and Barton presented to her for her signature, she did not in fact know what was going on. There was a continuing fraud and breach of fiduciary duty up to the time of the final settlement of January, 1943, in that settlement, and afterwards. We will call attention to some of the transactions which illustrate the truth of this statement.

In the beginning Miss Duniway did not turn over all of her securities to Barton; some, which she had inherited from her mother, she withheld for sentimental and other reasons. In June, 1939, however, Errion and Barton prevailed upon her to agree to the liquidation of these, her only remaining assets, and she and the other two trustees signed a writing, dated June 24, 1939, addressed to Barton which authorized him to apply the proceeds of the sale of these securities "to the purchase of a First Mortgage on Five acres of Oyster Plantations with full seeded crop of growing oysters thereon." The mortgage was to be in the principal sum of $3,500, and the writing concludes: "The balance of the proceeds remaining after the purchase of the said first mortgage is to be placed to the credit of the estate in the Bank of California of Portland." It should be observed here that the minutes of a meeting of July, 1939, recite the adoption of a motion authorizing the opening of an account with the Bank of California, "deposits being *authorized* by any officer" (italics added). But no moneys were deposited in the account, if one was ever opened. The securities in ques-

tion were sold for a sum in excess of $4,800, and the authority contained in the writing of June 24, 1939, was carried out by the execution by Barton to the "Estate" of a note for $4,700, payable within 5 years and secured by a mortgage executed by Errion and Barton on 5 acres of oyster land for which they had paid $250. The note which Barton gave recited that a mortgage "covering five acres more or less of oyster plantations in Coos County, Oregon, and the oysters thereon growing from seed planted in 1939" was the sole security for its payment, and that Barton was not personally liable therefor. Miss Duniway never realized anything from oysters said to be on this land, and no part of the $4,700 principal or interest was ever paid her unless it can be said that she was paid in the settlement of January 30, 1943. On July 20, 1940, this note was replaced by one for $4,962 (the additional amount being for accumulated interest) payable by the "Estate" to Katherine S. Duniway. She thereby found herself in the position of owing herself for money loaned to Errion and Barton.

On January 2, 1941, as disclosed by the minutes of that date, there was "reshuffling", as the plaintiff called it, of the "Estate's" holdings, the reasons for which are obscure. Miss Duniway's testimony on cross-examination when she was asked to read a certain document which she had signed and which related to the transactions shown in these minutes and to state whether she understood it, is quite pertinent. She said: "Well, it sounds as though it had something to do with some of their maneuvers on the assets that they liquidated for me. They were always taking things out of one pocket and putting them in another and I never did follow the process. No, that baffles me." The court then suggested to counsel for Barton: "I don't think

you understand it either. The plaintiff doesn't understand it. Maybe I don't understand it." Nor do we. However, it would seem that as a result of the "reshuffling" the "Estate" now owned 400 oyster beds (there are 8 beds to an acre) and 100 acres of oyster lands. The 100 acres are designated in the minutes, "Tillamook tracts, 100 acres, $5,000.00." Under our decision in *Union Land Associates v. Ussher,* 174 Or. 453, 149 P. 2d 568 (1944), fee simple title to oyster lands in Tillamook Bay cannot be acquired. The evidence shows that no rights whatever in such lands were ever transferred to the "Estate" or Miss Duniway, and that all Errion or Barton paid for the 100 acres in question was the filing fee for the right to plant, cultivate and take oysters upon them.

The value of the oyster lands held by the "Estate" as of January 2, 1941, as shown by the minutes of that date, was $32,500. The minutes further show that there was a balance due the "Estate" of $10,545.12. They do not disclose who owed this balance; however, in accordance with action taken at the meeting, Errion and Barton, to secure this indebtedness, gave a bill of sale to the "Estate" covering their oyster canning plant at Coos Bay and "the crop of oysters growing on 100 beds in Coos Bay." In connection with this transaction the "Estate" gave two options, one to Associated Coos Bay Land Owners, a corporation controlled by Errion and Barton, and the other to Errion and Barton. We will not go into details about these options, which are very complicated, but will merely state our conclusion that they were contrived for the twofold purpose of further impressing Miss Duniway with the value of her investment and of avoiding personal liability of Errion and Barton for the sum of $10,545.12 owing to the "Estate."

On April 7, 1941, as disclosed by the minutes, the trustees of the "Estate" accepted an offer of Associated Coos Bay Land Owners of $5,000 for 100 acres of the "Estate's" oyster lands in Coos Bay, the consideration "payable by a demand note * * * payable * * * at the option of the maker * * * in cash or by a warranty deed for a like amount of adjacent oyster beds." Such a note was given to the "Estate."

We now refer again to the settlement of January 30, 1943. Miss Duniway testified that the decision to dissolve the "Estate" was made because, as she was told, "there was legislation passed so that this form of trust was no longer being as advantageous as it had been thought when it was established." As we have said, the outstanding obligations to the "Estate" were cancelled. These included (what had formerly been the obligation of Errion and Barton) the note for $4,962 from the "Estate" to Miss Duniway (that is, from herself to herself); the indebtedness of $10,545.12 from Errion and Barton to the "Estate" (with no personal liability); and the mortgage on the cannery given to secure that indebtedness; and the note for $5,000 (with no personal liability) given by Associated Coos Bay Land Owners, a corporation controlled by Errion and Barton.

As previously observed, the value of the assets delivered to Miss Duniway in the settlement was, on paper, the exact equivalent of the amount which she had paid in—that is, which Errion and Barton had received through the liquidation of her properties. But, as we have already seen, the 100 acres in Tillamook Bay, valued at $5,000, were non-existent so far as she was concerned. As to the 100 oyster beds in Coos Bay, valued with the crop at $12,500, it developed on cross-examination of Barton that these were a part of lands

which had been acquired by Coos County at tax foreclosure sale, and that Errion's and Barton's corporation, Associated Coos Bay Land Owners, had bought them from the county at a price not in excess of $5 an acre. Since there are 8 beds to an acre, the amount which they charged Miss Duniway for the 100 beds was 200 times the amount which they paid. If there was a crop, Miss Duniway received nothing from it.

The notes valued at $12,772.56 and the purchase agreements valued at a like sum in the settlement were assigned to Miss Duniway by Associated Coos Bay Land Owners, to which they were made payable. Their value is highly problematical. In 1948 Miss Duniway had been able to collect only $4,200 principal and $1,000 interest on these obligations represented to be worth over $26,000. She has been forced to bring suit on some of them. The question of their value will again be referred to in connection with the discussion of Barton's profit and the relief to which plaintiff is entitled.

After the settlement, Miss Duniway's continued faith in Errion and Barton is shown by the fact that in 1944 and again in 1945, at Errion's request, she executed to him deeds in blank to parts of her holdings of Coos Bay lands. Errion, without her knowledge, delivered these deeds to others, apparently in each instance for a valuable consideration. She did not learn what disposition had been made of the deeds until she saw the record of them in a printed abstract of title to oyster lands in Coos Bay, published sometime after April 15, 1947. She received no part of the consideration. She testified that she did not know that Errion and Barton paid only $50 an acre for oyster lands, which they sold to her at $1,500 and $1,800 an acre, until after she had read the transcript of testimony in a case in the United States District Court for the District of Oregon

in which Errion and Barton had been indicted and tried for using the mails to defraud. They were tried in February and March, 1946, and were acquitted. The evidence is very clear that, even after they were indicted, Miss Duniway did not lose faith in them and wished to do anything in her power to aid in their defense. Miss Duniway is an intelligent and highly educated woman, but she also appears to have been a very susceptible one, and she was dealing with men who are not only unscrupulous, bold and designing, but also clever and plausible. As she testified: "Their language sounded charming. With a beautiful grand flourish they presented to her [meaning Miss Duniway] the wonderfulness of business." They were able to deceive her in the beginning and to continue to deceive her when her expectations of profits from her oyster lands were disappointed. Her faith in them was not shaken when charges of fraud were made by others with whom they had dealt. She accepted the settlement of January, 1943, which reeked with deception, without demur. She continued to be a champion of their integrity even after they were indicted. There is no evidence that she knew that they were using her money in their business until sometime after the beginning of 1946. It is an extraordinary story of misplaced confidence; but it occurred.

In *Wood v. Honeyman*, 178 Or. 484, 567, 169 P. 2d 131, 171 A.L.R. 587, we quoted with approval from Scott on Trusts, § 219.2: "A beneficiary is not barred by laches from holding a trustee liable for breach of trust if he did not know or have reason to know of the breach of trust."

In *McIver v. Norman*, 187 Or. 516, 549, 205 P. 2d 137, 213 P. 2d 144, 13 A.L.R. 2d 749, we approved the following statement of the rule in equity respecting

laches made by the court in *Indiana & Arkansas Lumber Co. v. Brinkley,* 164 Fed. 963:

> "The established rule for the administration of the doctrine of laches in equity is that under ordinary circumstances a suit in equity will not be stayed before, and will be stayed after, the time fixed by the analogous statute of limitations at law. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it."

■ Delay induced by the fraud of the defendant is not laches. 4 Bogert, Trusts and Trustees, Part 2, 190, § 949.

■ The evidence satisfies us that the plaintiff did not ascertain that defendants had defrauded her until after the month of March, 1946. Their continuing fraud, misrepresentations and promises excused her failure to learn the facts before that time. The suit was brought within the time limited by the analogous statute of limitations, § 1-206, O.C.L.A., which prescribes a period of two years within which to commence an action based upon fraud or deceit with the proviso, "the limitation shall be deemed to commence only from the discovery of the fraud or deceit." Moreover, mere delay itself does not constitute laches unless the delay worked to the injury of another. *City of Pendleton v. Holman,* 177 Or. 532, 547, 164 P. 2d 434, 162 A.L.R. 249, and Oregon cases there cited. The delay in this case has in no way injured Barton.

■ For the foregoing reasons the defense of laches and the other defenses suggested are without merit.

■ ■ We come to the troublesome question in the

case, namely, the amount of the judgment which should be awarded to the plaintiff. As stated at the outset of this opinion, the suit is now one to recover profits made by Barton through the misapplication of trust funds. A fiduciary may be charged as a constructive trustee as to the proceeds or avails of his breach of trust. *Jansen v. Tyler,* 151 Or. 268, 269, 47 P. 2d 969, 49 P. 2d 372; 3 Bogert, Trusts and Trustees, Part 1, 96, § 483; 54 Am. Jur., Trusts, 173, 174, §§ 226, 227. See *Reynolds v. Stevens,* 66 R.I. 220, 18 A. 2d 637. Under this principle Barton was a constructive trustee of the moneys he held as proceeds of the liquidation of Miss Duniway's assets in excess of the reasonable market value of the oyster lands she bought from him and Errion. They used this money in their own business without her knowledge or consent, and thereby subjected themselves to liability for the profits earned thereon. Restatement, Trusts, 568, Comment d. Cf. *Jansen v. Tyler,* supra.

Except for "a few hundred dollars", Barton had no money at the inception of the enterprise in December, 1938, and it does not appear that Errion had any. The only other capital invested was $9,000, which Barton borrowed from his brothers. We are satisfied from the evidence that Miss Duniway's money helped to produce whatever profits were made. Mainly, these are balances owing for the purchase price of oyster lands sold to the public by Errion and Barton and evidenced by notes and contracts, some of which Miss Duniway received in the settlement of January, 1943. Errion and Barton fell out after that, and, in the division of assets that followed, Barton received notes and contracts having a face value of $92,000. He assigned them to a corporation for collection under an agreement that he was to receive 50 per cent of the amounts col-

lected. He testified that his "equity" would pay him "about 40,000, 45 or 46 thousand, I believe." But, when asked on cross-examination if he was willing to have the court find that these obligations were worth 100 cents on the dollar, he prudently answered, "I think I'd better not answer that question. I haven't had a chance to go into all the aspects."

We were told on the argument by counsel for Barton that the trial judge based his judgment of $46,325 against Barton upon this evidence, but we cannot be certain of this because neither the findings, nor the judgment, nor the proceedings in the record on an occasion when the amount of the judgment was discussed by court and counsel, reveal the source of the figure. The situation suggests the desirability of more detailed findings in a case of this kind.

Examining the evidence to determine whether the amount so found can be sustained on the basis suggested, we are met with the utmost difficulty in setting a value upon these notes and contracts. To begin with, claims which the owner assigns under an agreement to pay the assignee 50 per cent of whatever is collected are by that very fact suspect. These claims are now in litigation, or at least were at the time of the trial in the Circuit Court. In 1944 Miss Duniway turned back to Errion and Barton $12,000, face value of her notes and contracts, because they were uncollectible, receiving other assets in their stead which she testified were "worse." There is evidence, which we think is entitled to belief, that a considerable block of the notes and contracts were transferred by Associated Coos Bay Land Owners, to which they were made payable, to a third party, because it was thought or feared that they were subject to defenses in the hands of the original payee. The mail fraud charge in the Federal court against

Errion and Barton was in connection with sales of oyster lands in Coos Bay. Though they were acquitted, the fact that there was such a prosecution would, in all probability, add to the difficulties of collection.

■ In view of the foregoing facts, the value of these obligations, in our opinion, can never be fairly appraised until the process of collection shall have been completed. At this time, on the record before us, that value is entirely too speculative to be employed as the basis of a judgment.

There is evidence of other profits made by Barton, but here again the evidence is clouded with uncertainty. No auditor testified in this case, and the task of attempting an audit of the books and records in evidence is one beyond the capabilities of the court.

The plaintiff, however, is not for these reasons to be deprived of a remedy. In such a case the beneficiary of the trust is entitled to recover interest, in many instances compounded, on the amount of the fund misapplied and used in the trustee's own business. We quote from the authorities:

"* * * Where the trustee has used trust funds in his own business, the court will not usually give to the trust a definite share of the profits, but will charge the trustee with interest at a rate based to some extent upon the size of the profits earned in the business if the rate of return is larger than simple interest at the legal rate." 1 Perry on Trusts and Trustees (7th ed.) 715, § 429.

"If the trustee uses trust funds in his own business and it does not appear how much he has earned thereon, he is ordinarily chargeable with compound interest on the ground that he probably received a return from the trust fund so used at least equal to compound interest." Restatement, Trusts, 568, Comment d.

"Whether simple or compound interest shall be

allowed, where interest is the basis, is a question of discretion and fact in each case. If simple interest will adequately compensate the cestui que trust, it will be added; if compound interest will more accurately make the beneficiary whole, then that standard of computation will be followed." 4 Bogert, Trusts and Trustees, Part 1, 420, § 863.

"* * * As Chancellor Walwroth said: 'Stating the account with periodical rests, and compounding interest, is only a convenient mode, adopted by the court to charge the trustee with the amount of profits supposed to have been made by him in the use of the money; where the actual amount of profits, which he has made, beyond simple interest, cannot be ascertained.' Compound interest is, however, more often allowed in cases involving fraud, willful misconduct, or other gross delinquency, than in instances of honest mistake or bad judgment." 4 Bogert, *op. cit.*, 423, § 863.

As illustrating the application of these rules see *Page's Ex'r. v. Holman*, 82 Ky. 573; *Faulkner v. Hendy*, 103 Cal. 15, 36 P. 1021.

In view of the defendant Barton's fraud, we hold that the plaintiff is entitled to recover from him interest at the rate of 6 per cent per annum, compounded annually, on the amount of the trust funds misapplied by him. The cause will be remanded to the Circuit Court for the purpose of making the necessary computations and entering a new decree and judgment in accordance with the following rules: In determining the amount of the converted trust funds on which interest is to be allowed, $50 an acre, or a total of $1,250, should be taken as the market value of the 25 acres of oyster lands conveyed to the "Estate" in 1939, and should be deducted from the total sum received by Barton, to-wit: $43,045.12. As this sum was not received all at one time, the dates at which various portions of it were received

should be ascertained and interest reckoned accordingly. Interest should run to the day upon which Miss Duniway received the return of her principal in her settlement with Errion. Whatever has been paid to Miss Duniway in excess of the principal amount in the settlement with Errion and in the collection of balances owing on notes and contracts received by her in the settlement of January, 1943, should be credited against the amount of interest so found, and judgment entered for the balance. In this connection the court should ascertain whether Miss Duniway has collected $12,000, or any other sum, in settlement of an action brought by her in Marion County, Oregon, on some of her notes and contracts. A statement to that effect was made upon the argument, but the record in that regard is inconclusive. Whatever sum may have been thus received by her should be credited against the amount of interest that shall be found. Neither party will be allowed costs.

The decree is modified and the cause remanded to the Circuit Court for further proceedings in conformity with this opinion.